482 F.2d 842
 83 L.R.R.M. (BNA) 2823, 71 Lab.Cas. P 13,841
 MOBIL OIL CORPORATION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
OIL, CHEMICAL AND ATOMIC WORKERS INTERNATIONAL UNION,
AFLCIO, and its Local Affiliate 7-507, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 Nos. 72-1415, 72-1538.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 21, 1973.
Decided July 17, 1973.
 
 Francis F. Sulley, Gilbert A. Cornfield, Chicago, Ill., for petitioners.
 Peter G. Nash, Gen. Counsel, Jay E. Shanklin, Atty., N.L.R.B., Washington, D. C., for respondent.
 Before STEVENS, Circuit Judge, GRANT*, Senior District Judge, and GORDON**, District Judge.
 STEVENS, Circuit Judge.
 
 
 1
 The question presented is whether employees have a statutory "right to representation" at fact-finding interviews conducted by management during an investigation of suspected theft of company property. Distinguishing a series of earlier cases, the Board held that such a right was created by Sec. 7 of the National Labor Relations Act for employees who (a) personally requested Union representation at such interviews, and (b) reasonably feared that their jobs were in jeopardy. The Union contends that there is no statutory or logical basis for the Board's limitations on the right, while the Company argues that the right itself does not exist unless created by contract. These arguments persuade us that the Board has adopted an untenable interpretation of Sec. 7 of the Act.
 
 I.
 
 2
 The facts are undisputed. In April, 1969, the Company's security department began an investigation of unauthorized removal of Company property at its Cicero plant. On July 1, management decided to interview nine employees suspected of complicity.[1] No decision to discipline any of the nine suspects was made before the interviews began. The Board found, however, that the Company had "decided that during the interviews no union representative would be permitted and that none would be allowed prior to the Company making any preliminary decision. Should preliminary action be taken with respect to any of the individuals, upon request, union representation at that point would be allowed."[2]
 
 
 3
 The first employee interviewed (Matthews) did not request representation. However, before the second interview commenced, a Union representative requested that he be permitted to attend the remaining interviews; this request was refused. In addition to the request by the Union representative, which could reasonably be interpreted as a timely request on behalf of all of the unit employees except Matthews, two of the employees (Burnett and Smith) individually asked to have a Union representative present. Each of these requests was also refused.
 
 
 4
 After the interviews had been concluded six employees were suspended, two returned to work, and one resigned. Subsequently, five of the six suspendees were discharged, the sixth was suspended for five days, and the "return to work" decision for the other two was confirmed. Later, the Union filed a grievance on behalf of four discharged employees: Matthews (who had made no request for representation); Burnett and Smith (who made individual requests); and Hill (who made no individual request but presumably was covered by the Union's). The disposition of that grievance is not described in the findings.
 
 
 5
 Two months later the Union filed a charge relating to these four employees with the Board. On January 4, 1971, the complaint issued, describing the interviews and alleging two separate violations of the Act. Paragraph VIII alleged a violation of Sec. 8(a)(1) by interfering with the exercise of Sec. 7 rights of employees Matthews, Burnett, Smith and Hill; paragraph IX alleged a violation of Sec. 8(a)(5) by derogating the Union's status as exclusive collective bargaining representative.
 
 
 6
 Although the complaint clearly identified two separate theories, at the hearing before the Trial Examiner the parties apparently assumed that both legal issues turned on the factual validity of the general counsel's contention that the real purpose of the interviews was to make a record to support disciplinary action that had already been decided upon, and therefore that the refusal to permit a Union representative to be present violated both Sec. 8(a)(1) and Sec. 8(a)(5) under the Board's then recent decision in Texaco, Inc., Houston Producing Division, 168 NLRB 361.[3] The Company argued that Texaco was distinguishable and that this case was controlled by Board decisions finding no unfair labor practice if the interviews from which the Union is excluded are plainly fact-finding in character and precede any decision on discipline.[4]
 
 
 7
 The Trial Examiner's characterization of the issues indicated that both the Union's right to be present and the individual employee's right to be represented by the Union depended on the same factual determination. He stated:
 
 
 8
 "The issue of whether the denial of a union representative during the interviews herein contravenes the Statute concerns itself with the prohibitions contained in Section 8(a)(1) and (5) of the Act, specifically, the interference, restraint, or coercion of employees in the exercise of their right to bargain collectively through a representative of their own choosing and the refusal to bargain collectively with such bargaining representative with respect to wages, hours, and other terms and conditions of employment."[5]
 
 
 9
 In his findings of fact, which were accepted by the Board, the Examiner concluded that "no decision to discipline, tentative or otherwise, had been made by the Company prior to conducting the employee interviews. . . ."[6] He therefore held that the Company was under no obligation to permit Union representation during the interviews, and neither Sec. 8(a)(1) nor Sec. 8(a)(5) had been violated. He recommended dismissal of the entire complaint.
 
 
 10
 Although the case was treated by the Hearing Examiner as one involving the right to Union representation in bargaining with the Company-and therefore with the primary emphasis on Sec. 8(a)(5) and Sec. 9(a) of the Act-the Board's decision rested on a different legal theory. The Board accepted the conclusion that there was no violation of Sec. 8(a)(5)-and presumably no impairment of the Company's obligation to treat the Union as the exclusive bargaining representative of the unit employees -but held that the denial of the requests by Burnett and Smith violated Sec. 8(a)(1). Under the Board's reasoning, the Company properly rejected the Union's request to represent Hill and others, but improperly rejected the requests by Burnett and Smith to be represented by the Union.[7]
 
 
 11
 The remedy selected by the NLRB is attacked by both the Union and the Company. The Board ordered the Company to cease and desist "from requiring that any employee take part in an interview or meeting without union representation, if such representation has been requested by the employee and if the employee has reasonable grounds to believe that the matters to be discussed may result in his being subject to disciplinary action." App.53. No reinstatement, back pay, or other relief for either Burnett or Smith was ordered.
 
 
 12
 The Board's decision rests squarely on its reading of Sec. 7 of the Act. Before considering the language and basic purpose of that section, it is appropriate to identify certain matters that are not involved on this appeal.
 
 
 13
 First, we are not concerned with the employees' unquestioned right to bargain collectively for a contractual provision which would guarantee them Union representation at investigatory or, indeed, other interviews with management. Apparently that type of contractual protection was sought, but not obtained, by the Union in its 1970 negotiations with the Company. The employees' right to use economic pressure to secure such a condition of employment is plainly guaranteed by Sec. 7 of the Act.
 
 
 14
 Second, we are not concerned with the effort of individual employees to enforce or to ascertain the true character of the contractual terms which their collective bargaining agent has negotiated for them. Cf. NLRB v. Ben Pekin, 452 F. 2d 205 (7th Cir. 1971). Our broad construction of Sec. 7 in such a context is inapplicable here since, admittedly, the employees' requests were unrelated to any contractual right.
 
 
 15
 Third, this is not a case in which there is any danger that the questioning was actually motivated by a desire to impair the employees' right to organize, to detect Union activity, or in any way to influence collective bargaining negotiations. Considerations which may have influenced Board decisions in such cases are not present here.[8]
 
 
 16
 Fourth, the record in this case does not present us with the task of reviewing the Board's evaluation of the relative importance of the employees' interest in fair procedures and protection from arbitrary discharge as opposed to management's interest in effective investigation of inventory shortages and suspected dishonesty. Nothing in the Board's opinion indicates that the Board itself made any attempt to balance the conflicting interests affected by its decision. On the contrary, its opinion simply explains the conclusion as mandated by the language of the statute.[9]
 
 
 17
 Finally, we do not ourselves resolve the policy question which counsel have extensively argued in their briefs. From the employee's standpoint, there are certainly valid and persuasive reasons for requiring Union participation in any management interview which may affect his further employment. Those reasons are particularly compelling when possible criminal charges lurk in the background. On the other hand, from the standpoint of management, and indeed the entire economy, the delays and costs associated with an adversary, or semi-adversary, fact-finding process may impose burdens on efficient management which a cost-conscious, competitive business cannot tolerate. Of course, this question may be answered in different ways by freely negotiated collective bargaining agreements. But whether to impose one answer on the economy as a whole presents a question of national policy that must be resolved by Congress.
 
 
 18
 Notwithstanding the breadth of the language contained in Sec. 7, we do not believe Congress answered that question when it passed the Wagner Act in 1935.[10] In a literal sense it may be true, as the Board argues, that if a Union representative attends an interview with an employee, the two are engaged in "concerted activity," and also that their purpose is "mutual aid or protection." But such parsing of a sentence apart from its historical context and the central purpose of the section is inappropriate. For it is well settled that certain activities which are described by a literal reading of Sec. 7 are not in fact protected.[11]
 
 
 19
 The "central purpose" of the National Labor Relations Act "was to protect employee self-organization and the process of collective bargaining from disruptive interferences by employers." American Ship Building Co. v. NLRB, 380 U.S. 300, 317, 85 S.Ct. 955, 966, 13 L.Ed.2d 855. The basic thrust of Sec. 7 is to enable employees to organize and to apply economic pressure against their employers in appropriate situations.[12] Scholarly analyses of the reach of Sec. 7 devote almost no attention to the language of the section, but instead consider the various situations in which the use of economic pressure by employees is appropriate.[13] In our opinion, economic pressure may properly be applied to compel employers to follow acceptable investigatory procedures, or to determine the consequences of various kinds of misconduct, but economic pressure should not be a component of the factfinding process itself. The requested Union representation at an investigatory interview is clearly not the kind of "concerted activity" with which Sec. 7 is primarily concerned.
 
 
 20
 If we turn from the central purpose of Sec. 7 to a consideration of its language, we also find the Board's reading unacceptable. The relevant portion of the section provides:
 
 
 21
 "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, . . . ." 29 U.S.C. Sec. 157. (Emphasis added.)
 
 
 22
 Nothing in that text indicates that the right to engage in a given concerted activity should be protected when asserted by an individual employee but not when a request is made by his bargaining representative. Nor does the text suggest the source of the Board's view that the right of representation depends on whether the employee has any reasonable basis for believing that his job is in jeopardy. The carefully tailored limitations on this procedural right were designed by the Board, not by any statutory mandate.[14]
 
 
 23
 A fair interpretation of the broad purpose and language of Sec. 7 persuades us that the novel "right to representation" recognized by the Board in this case is not a "concerted activity" within the meaning of the Act. This conclusion is supported by precedent, NLRB v. Ross Gear & Tool Co., 158 F. 2d 607 (7th Cir. 1947);[15] Texaco, Inc. v. NLRB, 408 F.2d 142 (5th Cir. 1969); and by history. If the Board's interpretation of Secs. 7 and 8(a)(1) correctly reflected the will of Congress, we are persuaded that this interpretation would have been recognized many years ago.
 
 
 24
 Enforcement denied.
 
 
 
 *
 Senior District Judge Robert A. Grant of the Northern District of Indiana is sitting by designation
 
 
 **
 District Judge Myron L. Gordon of the Eastern District of Wisconsin is sitting by designation
 
 
 [1]
 The nine included six unit employees, a non-unit employee, and two supervisors. Except for one supervisor who resigned without being interviewed, each was interviewed separately by a two-man team consisting of one security agent who did the questioning and one administrative employee who served as a witness. Each employee was confronted with certain evidence and asked for an explanation. At the end of the interview, the security agent left the room to review the case with the Plant Manager, Peckham, and Operation Superintendent Hahn. If Hahn and Peckman decided that suspension was appropriate, one of them would go into the interview room, give the employee a final opportunity to explain, and inform him of the decision. Higher management officials later reviewed the cases and made the final decision. Of the nine suspects, one was absent on July 2 and subsequently resigned without being interviewed; five (including one supervisor) were fired, one was suspended for five days, and two were not disciplined
 
 
 [2]
 Trial Examiner's Decision, p. 3; App. 41
 
 
 [3]
 Enforcement of the Texaco decision was denied. Texaco, Inc., Houston Producing Division v. NLRB, 408 F.2d 142 (5th Cir. 1969). The court held that the evidence was overwhelming that the interview was investigatory in nature and that there was absolutely no evidence that the purpose of the interview was to deal with the employee about the consequences of his alleged misconduct. As the court stated, the "function of the interview was to question Aloniz, not to bargain with him." Id. at 144
 
 
 [4]
 The Company relied principally on Chevron Oil Co., 168 NLRB 574; Jacobe-Pearson Ford, 172 NLRB No. 84; Dayton Typographical Serv. Inc., 176 NLRB No. 48
 
 
 [5]
 Trial Examiner's Decision, p. 8; App. 46
 
 
 [6]
 Trial Examiner's Decision, p. 10; App. 48
 
 
 [7]
 "An employee's right to union representation upon request is based on Section 7 of the Act which guarantees the right of employees to act in concert for 'mutual aid and protection.' The denial of this right has a reasonable tendency to interfere with, restrain, and coerce employees in violation of Section 8(a)(1) of the Act. Thus, it is a serious violation of the employee's individual right to engage in concerted activity by seeking the assistance of his statutory representative if the employer denies the employee's request and compels the employee to appear unassisted at an interview which may put his job security in jeopardy. Such a dilution of the employee's right to act collectively to protect his job interests is, in our view, unwarranted interference with his right to insist on concerted protection, rather than individual self-protection, against possible adverse employer action." Board's Decision at 2; App. 51. This language contains the Board's entire analysis of the statute
 
 
 [8]
 Conceivably, such factors, although not relied upon by the Board, might lend support to its order in Quality Manufacturing Co., 195 NLRB No. 42, enforcement pending (4th Cir.) 481 F.2d 1018. In this case, Quality Manufacturing was the sole authority on which the Board relied. That case is not, however, precisely in point. There an employee was discharged for refusing to attend an interview unless accompanied by a Union representative, and the company disciplined a Union officer for requesting to be allowed to attend. In this case, on the other hand, the employees did attend the interviews and were disciplined for stealing company property, not for requesting Union representation. Nevertheless, the Board's decision in Quality Manufacturing was the first decision to apply the "mutual aid and protection" language in the interview context
 
 
 [9]
 This comment is also applicable to the Board's decision in Quality Manufacturing, supra note 8, on which the Board relied in this case. That decision likewise rests simply on the Board's reading of Sec. 7 rather than any exposition of policy
 
 
 [10]
 The "mutual aid or protection" language of Sec. 7, 49 Stat. 452, appeared earlier in Sec. 2 of the Norris-La Guardia Act, 47 Stat. 70, and Sec. 7(a) of the National Industrial Recovery Act, 48 Stat. 198. The same language also is used in Sec. 1 of the National Labor Relations Act, 49 Stat. 449-450, 29 U.S.C. Sec. 151
 Perhaps due to its earlier usage, the legislative history of the Act reveals no particular concern for the language. Rather, Sec. 7 is spoken of generally: "The language restrains employers from attempting by interference or coercion to impair the exercise by employees of rights which are admitted everywhere to be the basis of industrial no less than political democracy. A worker in the field of industry, like a citizen in the field of government, ought to be free to form or join organizations, to designate representatives, and to engage in concerted activities." S.Rep. No. 1184, 73rd Cong., 2d Sess. 4. In introducing his bill, Senator Wagner also spoke in broad terms: "The national labor relations bill which I now propose is novel neither in philosophy nor in content. It creates no new substantive rights. It merely provides that employees, if they desire to do so, shall be free to organize for their mutual protection or benefit. * * * It seeks merely to make the worker a free man in the economic as well as the political field. Certainly the preservation of long-recognized fundamental rights is the only basis for frank and friendly relations in industry." 79 Cong.Rec. 2368. And, the committee report on the bill discussed Secs. 7 and 8 together: "These sections are designed to establish and protect the basic rights incident to the practice of collective bargaining . . . Neither the National Labor Relations Board nor the courts are given any blanket authority to prohibit whatever labor practices that in their judgment are deemed to be unfair." S.Rep. No. 573, 74th Cong., 1st Sess. 8.
 
 
 [11]
 See, e. g., Southern Steamship Co. v. NLRB, 316 U.S. 31, 62 S.Ct. 886, 86 L. Ed. 1246; NLRB v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627; NLRB v. Sands Manufacturing Co., 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682; NLRB v. Local No. 1229, IBEW, 346 U.S. 464, 477, 74 S.Ct. 172, 98 L.Ed. 195
 
 
 [12]
 "The Wagner Act was designed to eliminate the guerilla warfare that, as Chapter I indicated, had accompanied struggles over organization in the United States. Section 7 of that act broadly affirmed the rights of self-determination and concerted activity, and Sec. 8 implemented those rights by proscribing a broad range of employer activities that had operated to impede unionization. Furthermore, Sec. 8, and subsection 8(1) [8(a)(1)] particularly, was deliberately elastic so that it could be used to strike down new forms of interference that were likely to develop and that might not fit neatly under the more specific provisions of subsections 2 through 5. H.R.Rep. No. 969, 74th Cong., 1st Sess. 15 (1935). The sweeping and plastic character of of the restrictions on employer power was to confront the board and the courts with the task of reconciling legitimate employer interests and conflicting interests in employee self-determination and organization." B. Meltzer, Labor Law: Cases, Materials, and Problems 892 (1970)
 
 
 [13]
 See, e. g., Getman, Protection of Economic Pressure by Sec. 7 of the National Labor Relations Act, 115 U. of Pa.L.Rev. 1195 (1967)
 
 
 [14]
 Before this court, the Board's counsel defended the decision as establishing a right of "presence" as opposed to "representation," a distinction similarly lacking in statutory foundation
 
 
 [15]
 In Ross, the employer had fired an employee for refusing to attend an interview without representation. The court found no unfair labor practice: "Assuming that an employee has a right to be represented by the union in the discussion or presentation of a labor grievance with an employer, such a right does not exist in the instant case. This is so, in our view of the matter, because there is no basis for the contention that such a grievance was involved." 158 F.2d at 613. While that case turned on the right to present a grievance and did not examine the "mutual aid or protection" language, enforcement of the Board's order would be inconsistent with the major premise underlying the essential holding of Ross-that there is no statutory right to representation at interviews not involving the presentation of a grievance. We have no reason to doubt the validity of the Ross decision