NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

QUALITY MANUFACTURING COMPANY, Respondent.

No. 72–1663.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 6. 1972.

Decided July 19, 1973.

Stanley J. Brown, Atty., N. L. R. B. (Peter G. Nash, Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Marcel Mallet-Provost, Asst. Gen. Counsel, and William F. Wachter, Atty., N. L. R. B., on brief), for petitioner.

Bernard P. Jeweler, Baltimore, Md. (Bernard W. Rubenstein, and Edelman, Levy & Rubenstein, Baltimore, Md., on brief), for intervenor.

John E. Jenkins, Jr., Huntington, W. Va. (Jenkins, Schaub & Fenstermaker, Huntington, W. Va., on brief), for respondent.

Before BOREMAN, Senior Circuit Judge, and RUSSELL and FIELD, Circuit Judges.

BOREMAN, Senior Circuit Judge:

This case is before the court on the application of the National Labor Relations Board for enforcement of its order, issued on January 28, 1972, against the Quality Manufacturing Company (hereinafter "Quality" or "the Company"). The Board's decision and order are reported at 195 N.L.R.B. No. 42.

The Company's owners and principal officers are Lawrence Gerlach, Sr., president; his wife, Mary Kathryn Gerlach, production manager; and their son, Lawrence Gerlach, Jr., general manager. The Upper South Department, International Ladies' Garment Workers' Union, has been certified as the collective bargaining representative of the Company's employees in an appropriate unit since 1968. The Union's chairlady, or steward, who represented the employees in disputes with management under the collective bargaining agreement was, at all times pertinent to this case, Delila Mulford.

On the morning of October 10, 1969, Mulford and three other employees met with all three Gerlachs, during which meeting the employees complained that they could not make a satisfactory wage under the piece work system then in effect. One of those so complaining was Catherine King, a long-time employee. The discussion ended with Gerlach, Jr., ordering Mulford to return to her work station and telling her "if [the employees] didn't like the way it was there in the company to go elsewhere."

Later that same day, Mrs. Gerlach noticed that King had shut down her machine and was waving her arms, gesturing, and causing some minor disturbance. Two other employees had stopped their machines and were watching King. Mrs. Gerlach directed her to resume production, but King told her to "tend to your business," whereupon Mrs. Gerlach ordered King to go to Mr. Gerlach's office. Upon King's request, Mulford left her own work station and accompanied King to the anteroom of Mr. Gerlach's office despite Mrs. Gerlach's warning to Mulford that she "had no business down there." When Mrs. Gerlach informed her husband of what had transpired he told Mulford to return to her work station because "it wasn't a grievance and [they] didn't have any business with her," but Mulford refused. He then ordered King to come into his office for a discussion but King replied that she would not go without Mulford. Mr. Gerlach then told both King and Mulford to return to their work stations,

and they did so. On Sunday, October 12, Mr. Gerlach telephoned Mulford and informed her that she was suspended for two days. No reason for the suspension was given but, according to Mulford, she thought it was because of her conduct in seeking to represent King on October 10 in Mr. Gerlach's office.

On Monday, October 13, King found upon reporting for work that her timecard was not in the rack, which indicated under plant practice that she was wanted in Mr. Gerlach's office. This time King asked Martha Cochran, the assistant chairlady, to accompany and represent her. Cochran accompanied King without first "punching in" on her own timecard. They met Mrs. Gerlach outside the office and she warned Cochran that "your timecard is upstairs and my advice to you is to go on upstairs and go to work if you want your job." Mrs. Gerlach added that they (the Gerlachs) wanted to talk only to King and "take up where we left off Friday." Cochran replied "Well, Mrs. Gerlach, I'm sorry, but if that's what you want to talk to her about, that is Union business and she has asked me to represent her," stating that she was a union steward and that was her duty. Cochran and King then spoke to Mr. Gerlach and asked him if he was going to give King her timecard. He said that he would not until she came into his office and talked to him in private. Cochran and King sat and waited in or near the office for the remainder of that day. In the meantime, Cochran's timecard was also "pulled" from the rack.

On Tuesday morning, October 14, Cochran and King again went to Mr. Gerlach's office and asked Mr. Gerlach if he was going to return King's timecard. Gerlach again replied that he would not until King talked to him in private. Cochran asked about her own card and was informed that she had been suspended for two days for being away from her work station the prior day. King and Cochran then left the plant.

The next day, Wednesday, October 15, Mulford's suspension had ended and she returned to Mr. Gerlach's office along with Cochran and King. Mulford inquired as to the status of Cochran and King and was told that Cochran was under suspension and that King was wanted in Mr. Gerlach's office alone. Mulford then returned to work and Cochran and King left the plant.

On Thursday, October 16, Cochran's suspension had expired. She, Mulford and King returned to Mr. Gerlach's office when they were met by Mr. and Mrs. Gerlach. Mrs. Gerlach gave Cochran her timecard and she went to work. Mrs. Gerlach then told King that Mr. Gerlach wanted to see her in the office alone. King asked, "With Delila [Mulford]?" Mr. Gerlach said, "No,' not with Delila," and added that if King "went out the door she was finished." King left the plant. Mulford then asked if she should go to work and Mr. Gerlach replied, "You've abandoned your job. Your finished." Mulford left the premises.

That same day, October 16, Cochran went to the office of Gerlach, Jr., during the noon hour and sought to present written grievances on behalf of Mulford, King and herself. Gerlach, Jr., told her he didn't have time to fool with them since he was leaving town, and refused to accept the grievances. Cochran laid them on his desk but he picked them up and threw them in the trash. Gerlach, Jr., then walked into the work area, pulled Cochran's timecard, and told her, "You worked this morning, but you're not working this afternoon." Subsequently, Cochran went to the office of Mr. Gerlach and asked if she had been fired. He responded, "Just go home. You wanted to draw unemployment now go on and draw it." Cochran left the plant but telephoned the office later that afternoon and requested that Mr. Gerlach's secretary ask him if she was to report to work the next day. She was told, "He said no." She told the secretary to "tell him that he can reach me at

my home phone when he needs me." Cochran was never notified to come back to work.

■ The full Board held that the Company violated Section 8(a)(3) and (1) of the Act upon a finding that Cochran was discharged because she sought to engage in a protected union activity, *i.e.*, filing grievances on behalf of herself, Mulford, and King. The record contains substantial evidence to support the Board's finding and its order with respect to Cochran's illegal *discharge* will be enforced.

The Board also found (member Kennedy dissenting) that the Company violated Section 8(a)(1) of the Act by discharging King because of her insistence on union representation when summoned to an interview at which she had "reasonable grounds to believe that disciplinary action might result from the Employer's investigation of her conduct," and by suspending and discharging chairlady Mulford and suspending assistant chairlady Cochran because they sought to represent her at such an interview. We hold that on the facts of this case King had no right to have a union representative present at the requested meetings with her employer, and deny enforcement of that portion of the Board's order.

In N.L.R.B. v. Ross Gear & Tool Co., 158 F.2d 607 (7 Cir. 1947), a female employee named Ford had engaged in a serious dispute with other employees. When several employees threatened to resign unless Ford was discharged, she was ordered to report to a supervisor's office to discuss the controversy. After Ford twice refused to attend unless accompanied by union representatives, she was discharged for insubordination, *i.e.*, refusal to comply with the order of the supervisor. The Board found that her discharge was because of her insistence on her right to have the union represent her at the meeting and that such discharge was in violation of Section 8(a)(1) and (3) of the Act. The court

rejected this determination, commenting (158 F.2d at 613):

The Board in its brief states: "As the Board has pointed out the legality of Ford's dismissal turns upon the issue whether or not she was within her statutory right in insisting upon the presence of the Union committee when Strecker [the supervisor] ordered her to report to his office alone." A decision of this issue favorable to the Board would mean that any employee could with impunity refuse to comply with a direction by management and in effect abrogate a rule such as the one here involved. Assuming that an employee has a right to be represented by the union in the discussion or presentation of a labor grievance with an employer, such a right does not exist in the instant case. This is so, in our view of the matter, because there is no basis for the contention that such a grievance was involved.

In Dobbs Houses, Inc., 145 N.L.R.B. 1565 (1964), an employee was called in for an interview by her employer concerning reported misconduct. Her request that a union representative be present was denied, and at the conclusion of the interview she was discharged. In dismissing the complaint, the Board adopted the Trial Examiner's finding that the company had not violated Section 8(a)(1) of the Act by refusing to permit the union representative to be present at the employee's termination interview. The Trial Examiner had stated:

I fail to perceive anything in the Act which obliges an employer to permit the presence of a representative of the bargaining agent in every situation where an employer is compelled to admonish or to otherwise take disciplinary action against an employee, particularly in those situations where the employee's conduct is unrelated to any legitimate union or concerted activity. (145 N.L.R.B. 1571)

Similarly, in Electric Motors and Specialties, Inc., 149 N.L.R.B. 1432 (1964),

the Board adopted the Trial Examiner's conclusion that an employee who had been called in for a disciplinary interview (149 N.L.R.B. at 1440)

> . . . had not been called in connection with a pending grievance; her statutory and contract right to representation was inapplicable. The employee's right to representation *when she presents a grievance* is not violated when the employer calls her in for admonition or discipline. (Emphasis in original.)

In Texaco, Inc., Houston Producing Div., 168 N.L.R.B. 361 (1967), an employee was seen carrying a can of kerosene owned by his employer off company property. He was suspended almost immediately. An investigatory interview was scheduled and he requested that a union representative be permitted to attend, which request was denied, but the employee was informed that there would be no interview if he insisted on union representation. The employee chose to proceed, admitted taking the kerosene, and received additional discipline. The trial examiner found no violation of Section 8(a)(5) of the Act since the interview did not involve adjustment of a grievance, no grievance having yet arisen. The trial examiner found no violation of Section 8(a)(1) of the Act since the employee could have filed a formal grievance and thereby assured himself of union representation. The Board reversed. It found that the employer knew all the facts prior to the interview and that the interview was therefore not investigatory in nature but more concerned with providing a record which would support disciplinary action. It determined that, by such interview, the employer had unlawfully sought to deal directly with the employee on a matter affecting his terms and conditions of employment, and that such conduct "interfered with and restrained [the employee] in the exercise of his rights guaranteed by Section 7 of the Act," and "transgressed [the employer's] statutory obligation to bargain with the Union." The Board held that the employer's conduct violated Section 8(a)(1) and (5) of the Act. Enforcement of the Board's order was denied. Texaco, Inc., Houston Producing Division v. N.L.R.B., 408 F.2d 142 (5 Cir. 1969). The court stated (408 F.2d at 144, footnotes omitted):

> After a careful study of the record, we can find neither basis in fact nor in law for the Board's conclusion that a union representative should have been permitted to be present during the interview. The evidence is overwhelming that the interview was investigatory in nature and there is absolutely no evidence that the [employer] sought to deal with [the employee] about the *consequences* of his alleged misconduct. The function of the interview was to question [the employee], not to bargain with him.

In *Texaco, Inc., supra*, the court cited and discussed the Board's decisions in Chevron Oil Co., 168 N.L.R.B. 574 (1967), and Jacobe-Pearson Ford, Inc., 172 N.L.R.B. 594 (1968). Both these cases were decided by the Board subsequent to its decision in *Texaco, Inc., supra*, 168 N.L.R.B. 361 (1967). The court characterized them as proper recognition "that an employee's right to union representation does not apply to all dealings with his employer which may eventually or ultimately affect the terms and conditions of his employment." 408 F.2d at 144. The court continued (408 F.2d at 144–145, footnote omitted):

> In *Chevron Oil Co.*, the Board held that the exclusion of union representation from an employer-employee interview was not unlawful. There, a foreman had reported that nine employees had walked off the job fifteen minutes early in defiance of his orders. The employer interviewed the employees prior to arriving at a decision on whether disciplinary action was warranted. The Board concluded that such a fact-finding meeting was merely an added effort on the employer's part to hear both sides of the story before reaching a decision, and point-

ed out that employees should not be shielded by a bargaining agent from company inquiries when management embarks upon an investigation to ascertain whether plant discipline has been breached. Likewise, in *Jacobe-Pearson Ford, Inc.*, the Board upheld the denial of requested union representation at a proposed meeting between an employer and his procrastinating employee finding that the meeting was called merely for the purpose of gathering information.

The result reached in these two cases would appear equally appropriate in the case *sub judice*. The Board's reason for finding otherwise is not entirely clear. It attempts to explain away the inconsistency by pointing out that in neither *Chevron* nor *Jacobe-Ford* had the employer committed himself to disciplinary action at the time of the interview. But as the Company urges in its brief and as it clearly appears from the record, the Company was not committed to disciplinary action. The foreman's [initial] suspension of [the employee] was conditional pending the outcome of an investigation and by no means *committed* the Company to a course of action. In any event, if an interview is truly investigatory, we see no reason why an employer's prior commitment to disciplinary action should necessarily transform it into a collective bargaining session requiring union representation.

After the court's decision in *Texaco, Inc., supra* the Board decided at least three other cases involving similar denials of union representation. Wald Manufacturing Co., 176 N.L.R.B. 839, 846 (1969), aff'd, 426 F.2d 1328 (6 Cir. 1970); Dayton Typographic Service, 176 N.L.R.B. 357, 361 (1969); Texaco, Inc., Los Angeles Sales Terminal, 179 N.L.R.B. 976, 982 (1969). Complaints which included allegations that such de-

nial of union representation violated the Act were dismissed in all three cases, the latter two involving allegations of Section 8(a)(1) violations. And, very recently, in Illinois Bell Telephone Company, 192 N.L.R.B. No. 138 (1971), a phone repairman was suspected of pilfering from a pay phone. He was interrogated, told the money was marked, and made to put the money from his pockets under a fluorescent light. Thereafter, he was interrogated again and his request for union representation was denied. Still later, he was told again the money had been marked and that the interrogator suspected him of having that money. Then the employee's money was again fluoroscoped and he was told that his money was marked. The employee was then asked to sign a statement, and the employee again asked for and was denied union representation. Later that day, the employee was suspended. The trial examiner's conclusion adopted by the Board was that at the time of these interrogations no discipline had been decided upon and the interrogation was fact-finding in nature, and that neither Section 8(a)(1) nor (5) of the Act had been violated because "the case law seems clear that the Act exacts no obligation upon the Company to accord the employee the right to union representation at that level of discussion." 192 N.L.R.B. at ——.

The Board's holding that Quality violated Section 8(a)(1) of the Act by discharging King and by suspending and discharging Mulford and suspending Cochran cannot be sustained unless it may be said that King had a right to union representation at the interviews with her employer. In determining that such a right existed here for the reason that King had "reasonable grounds to believe that disciplinary action might result from the Employer's investigation of her conduct," the Board departed from existing case law as set out above.[1]

1. Subsequent to its decision in the instant case the Board decided Mobil Oil Corporation, 196 NLRB No. 144 (1972), in which the Board rejected a contention that employees suspected of the theft of their employer's property were not enti-

**1024**

The Board took notice of what it called the *"Texaco* line of cases,"[2] but determined that they were distinguishable since:

> [N]one of those cases presented a situation where an employee or his representative had been disciplined or discharged for requesting, or insisting on, union representation in the course of an interview. In fact, the Section 7 right of individual employees to act in concert "for mutual aid and protection" was not directly considered in those cases. Rather those cases involved a determination of whether the right of the union to bargain collectively was such that an employer could not legally deny its request to participate in the interview. (195 NLRB at ——.)

It is our conclusion that the Board's attempt to distinguish these prior cases cannot be sustained. Every situation wherein an employee is directed by management to cooperate in an investigatory interview carries the implicit threat of discipline if such direction is not obeyed. And the statement that a particular Section 7 right mentioned in the above quotation had not been previously considered is inaccurate when examined in the context of the case before us. As illustrated by the cases cited in this opinion, the Board has many times been confronted with an alleged violation of Section 8(a)(1) in the context of a denial of union representation at employer-employee interviews. By necessary implication, Section 7 rights have been at issue in each of these cases.[3] Yet never has it been thought,

---

tled to representation during investigative interviews. The reasoning in *Mobil Oil* was similar to that upon which the decision here was premised. Member Kennedy dissented in *Mobil Oil* as he did in this case. The Board stated (196 NLRB at ——):

> An employee's right to union representation upon request is based on Section 7 of the Act which guarantees the right of employees to act in concert for "mutual aid and protection." The denial of this right has a reasonable tendency to interfere with, restrain, and coerce employees in violation of Section 8(a)(1) of the Act. Thus, it is a serious violation of the employee's individual right to engage in concerted activity by seeking the assistance of his statutory representative if the employer denies the employee's request and compels the employee to appear unassisted *at an interview which may put his job security in jeopardy*. Such a dilution of the employee's right to act collectively to protect his job interests is, in our view, unwarranted interference with his right to insist on concerted protection, rather than individual self-protection, against possible adverse employer action. (Emphasis added.)

That case is now pending in the Seventh Circuit, 482 F.2d 842, upon the Board's application for enforcement.

There is, of course, no doubt that employees have a right to union representation at interviews with the employer after

a grievance has been filed. The issue here is whether that right may be extended under the Act to require employers to permit an employee to have union representation at interviews hitherto not included within its scope, *i. e.*, whenever the employee has reasonable grounds to believe that disciplinary action might result from the employer's investigation.

2. *Texaco, Inc., Houston Producing Div., supra,* 168 NLRB 361, enforcement denied, 408 F.2d 142; Chevron Oil Co., *supra,* 168 NLRB 574; Jacobe-Pearson Ford, Inc., *supra,* 172 NLRB 594; Texaco, Inc., Los Angeles Sales Terminal, *supra,* 179 NLRB 976. In its brief to this court, the Board adds to the list of *Texaco* progeny, Wald Manufacturing Co., *supra,* 176 NLRB 839, *aff'd,* 426 F. 2d 1328; Dayton Typographic Service, Inc., *supra,* 176 NLRB 357; Illinois Bell Telephone Co., *supra,* 192 NLRB No. 138; Lafayette Radio Electronics Corp., 194 NLRB No. 77 (1971).

3. Section 7 of the Act, 29 U.S.C. § 157, gives employees "the right . . . to engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection."

   Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), provides that it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 7."

as the Board would hold here, that such rights require an employer to permit an employee to have a union representative present whenever the employee "has reasonable ground to fear that the interview will adversely affect his continued employment, or even his working conditions."

In support of its new theory as to the meaning and application of the Act, and the extent of employees' rights thereunder, the Board offers essentially the following statement: "After reflection, we have concluded that it is a serious violation of an employee's individual right to be represented by his union if he can only request or insist on such representation under penalty of disciplinary action." 195 NLRB at ——. The Board cited no supporting legislative history in its opinion nor does it offer any in brief or on argument to this court. It presents no persuasive analysis of the statutory provisions. It only adopted what "seems to us [the Board] to be the proper rule where, as here, the interview, whether or not purely investigative, concerns a subject matter related to disciplinary offenses." 195 NLRB ——.

It is clear beyond question, however, that the Board has no power to alter or rearrange employer-employee relations to suit its every whim. Rather, the Board can only determine whether the Act has been violated. And it would appear that in the entire history of the law as developed above, the management prerogative of conducting an investigatory interview such as Quality attempted here has not been considered a violation of the Act. The language in the concurring opinion of Justices Stewart, Douglas and Harlan in Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 225–226, 85 S.Ct. 398, 411, 13 L.Ed.2d 233 (1964), is apt:

> "It is possible that . . . Congress may eventually decide to give organized labor or government a far heavier hand in controlling what until now have been considered the prerogatives of private business management.

That path would mark a sharp departure from the traditional principles of a free enterprise economy. Whether we should follow it is, within constitutional limitations, for Congress to choose. But it is a path which Congress certainly did not choose when it enacted the Taft-Hartley Act."

For the above-stated reasons, enforcement of the Board's order insofar as it pertains to the discharge of King and Mulford and the suspensions of Mulford and Cochran is denied.

Enforcement granted in part and denied in part.