[S.F. No. 23015. In Bank. Apr. 30, 1974.]

SOCIAL WORKERS' UNION, LOCAL 535, SEIU, AFL-CIO et al., Plaintiffs and Appellants, v.
ALAMEDA COUNTY WELFARE DEPARTMENT et al., Defendants and Respondents.

**COUNSEL**

Levy & Van Bourg, Victor J. Van Bourg and Stewart Weinberg for Plaintiffs and Appellants.

Richard J. Moore, County Counsel, and Douglas Hickling, Deputy County Counsel, for Defendants and Respondents.

## OPINION

**TOBRINER, J.**—In this case we must determine whether a public employee may be disciplined for declining to attend, without his union representative, a meeting with his supervisor concerning the employee's alleged misuse of a county car at a union rally. The Alameda County Welfare Department (Department) ordered three-day suspensions for seven employees after the employees declined to attend such a meeting from which their union representative had been excluded. The employees, and their union, Social Workers Union, Local 535, SEIU, AFL-CIO (union), then sought a writ of mandate to compel the Department to set aside the suspensions, but the superior court denied the writ, concluding that the relevant statutory provisions granted the employees no right to the presence of a union representative at such a meeting with their employer. The union and the individual employees appeal from that adverse judgment. ·

For the reasons discussed below, we have concluded that a public employee's statutory right to effective union representation (Gov. Code, § 3500 et seq.) includes a right to have a union representative accompany him to a meeting with his employer when the employee reasonably anticipates that such meeting may involve union activities and when the employee reasonably fears that adverse action may result from such a meeting because of union-related conduct. In the instant case we find that the public employees could reasonably anticipate that the meetings, set up by their employer to investigate their transportation to a union rally protesting the employer's conduct, might result in disciplinary action related to their union activity; thus, we believe such employees were justified in insisting that their union representative be permitted to attend the meeting and were not subject to sanction for such insistence. Accordingly, we reverse the judgment as to those employees who properly exhausted their administrative remedies.

The essential facts underlying this litigation are not at issue. On May 14, 1969, the union sponsored a noon hour rally at the Alameda County Administration Building to protest, as described by the union, the failure of the County of Alameda to "meet and confer in good faith" with the union concerning subjects within the scope of representation allowable under the statute. (Gov. Code, § 3505.) An investigation undertaken by county administrators indicated that certain county vehicles were observed at the union rally; further examination of county garage records and "employee day sheets" suggested that some of the employees using these vehicles did not have official business at the administration building during the time in

question. The responsible county supervisor testified at the administrative proceeding that, based on these revelations, "circumstantially it appeared" that a misuse of county property had occurred. In July 1969, some 30 employees were ordered to attend individual meetings with the chief assistant welfare director or his deputy concerning the employees' possible misuse of county vehicles to attend the May 14, 1969, union rally.

A dispute soon arose over the right of the employees to be accompanied to these meetings by their union representative. After the chief assistant welfare director made clear that the union representative would not be permitted to attend, 23 employees acquiesced in the supervisor's demand that they appear alone before him or his assistant. Based solely on these meetings, the assistant supervisor transmitted a report on the matter to the welfare director including recommendations as to discipline.[1]

The seven employees involved in the instant case, however, declined to meet with the chief assistant welfare director or his deputy to discuss the alleged misuse of county vehicles in connection with a union rally without a union representative.[2] All seven individuals were ultimately suspended

---

[1]Thereafter three of the employees so appearing received a letter from the Department stating in part: "First the meeting with you was held because a car signed out to you had been reported in the vicinity of a Union demonstration (the non-County activity). A further check indicated that your job related activities on that day did not justify your being in the area. . . . You stated that you were unaware of rules forbidding the use of county cars in the manner which you did. Notwithstanding your unawareness it was not reasonable for you to assume that utilization of County equipment for transportation *in connection with an employee organization* was permissible." (Italics added.) Copies of these letters were placed in the employees' permanent personnel records.

[2]On July 24, 1969, petitioner Kemper, the first employee to be contacted by the supervisor, brought his union representative to the meeting scheduled for him, but was sent away when he refused to proceed in the absence of the representative. Kemper's meeting with his supervisor ended with following dialogue: Kemper: "I don't want to be belligerent, but I still feel that it is my prerogative to have the union rep with me and I would still like to have Mr. Bowers." The supervisor: "If that's the way you feel about it, you can leave."

At the administrative hearing before the county civil service commission, another of the suspended employees, Mrs. Brooks, testified that she had refused to attend the meeting without her union representative even though she had driven her own car to the rally and could provide evidence from her passengers to verify that fact; indeed, one of the passengers did testify to that effect at the hearing. When asked by the Department's counsel why she was reluctant to attend the meeting by herself in view of her innocence of any wrongdoing, Mrs. Brooks answered that she had already learned of Kemper's suspension in connection with these matters and felt that she "needed somebody, I didn't want to go talk to [the deputy supervisor] or . . . the Commission's attorney, or somebody else on such an issue."

for three days for insubordination in refusing to attend the interview without a union representative. Thereafter, the employees and their union commenced the instant proceeding, challenging the validity of the suspensions.

After reviewing the facts outlined above, the superior court concluded that "no law, ordinance, rule or regulation authorizes or requires the presence of Union representatives at such interview." "Such interview," in the language of the findings of the court, consisted of a confrontation by the county with workers upon the issue "whether or not the vehicles were in the area because the employees had departmental business in the vicinity, or, in the alternative, whether the vehicles were used for the transportation of the employees to and from the demonstration." On the basis of its conclusion, the court denied the requested writ of mandate.[3]

We shall explain why we have concluded that, contrary to the conclusion of the trial court, the subject matter of the employer's investigation in the instant case fell within the penumbra of the protected rights of the employees and justified the employees' claim to a right of union representation. Since the investigation touched upon the statutorily guaranteed associational rights of the employees, and since the employees could reasonably fear that the investigation might lead to disciplinary penalties for such union participation,[4] we hold that the employee could properly demand the presence of a union representative at such an interview.

The Meyers-Milias-Brown Act, the controlling statutory structure in this

---

[3]The superior court also determined that three of the seven employees (appellants Doyle, Pofscher and Chan) had failed to exhaust their administrative remedies, which constituted an additional ground for barring relief. In this appeal, appellants have not demonstrated that this finding of the superior court was erroneous, and accordingly we affirm the trial court's judgment with respect to these three employees.

The trial court additionally found that although a fourth appellant, Weber, had properly exhausted his administrative remedies by seeking relief from the Alameda County Board of Supervisors, Weber was not entitled to relief in this proceeding because the board of supervisors had not been joined as a defendant. Upon remand of this proceeding, however, appellants should be accorded an opportunity to amend their petition to join the board of supervisors as a party defendant.

[4]Although the trial court rendered a factual finding that the county confrontation with the employees did not "relate" to any union activity, the court also found the interviews were "to ascertain whether or not the vehicles were in the area because the employees had departmental business in the vicinity, *or in the alternative, whether the vehicles were used for the transport of the employees to and from the demonstration.*" (Italics added.) We shall explain *infra* that the right of representation afforded by the Meyers-Milias-Brown Act attaches, as a matter of law, to a confrontation, which an employee reasonably anticipates may involve his union activities and reasonably fears may ultimately lead to disciplinary action because of such union-related conduct.

field, is built upon the recognition of the rights of association and representation of the public employee.[5] Government Code section 3500 guarantees public employees "the right . . . to join organizations of their own choice and be represented by such organizations in their employment relationships with public agencies." After many years of indecision as to the organizational rights of public employees, the Legislature finally accorded them this basic right of association which, obviously, embraces that most vital aspect of unionism: the right of attendance at a union meeting or rally. Thus, section 3502 provides that "public employees shall have the right to form, join, and *participate in the activities of employee organizations* of their own choosing for the purpose of representation on all matters of employer-employee relations." (Italics added.)

Two sections of the code specifically protect public employees against interference or intimidation by public agencies in the exercise of the employees' right of association. Thus section 3506 provides: "Public agencies . . . shall not interfere with, intimidate, restrain, coerce or discriminate against public employees because of their exercise of their rights under Section 3502." Section 3508 reiterates this principle: "The right of employees to form, join and participate in the activities of employee organizations shall not be restricted by a public agency on any grounds other than those set forth in this section."[6] And, in recent years, numerous cases have enforced these prohibitions against a variety of employer conduct which impinged upon or threatened employees because of their union affiliations or activities. (See, e.g., *Ball* v. *City Council* (1967) 252 Cal. App.2d 136, 139-140 [60 Cal.Rptr. 139]; cf. *International Assn. of Fire Fighters* v. *City of Palo Alto* (1963) 60 Cal.2d 295, 300 [32 Cal.Rptr.

---

[5]See generally Grodin, *Public Employee Bargaining in California: The Meyers-Milias-Brown Act in the Courts* (1972) 23 Hastings L.J. 719; Witt, *Local Labor Relations* (1972) 23 Hastings L.J. 809.

[6]Section 3508 provides in relevant part: "The governing body of a public agency may . . . designate positions or classes of positions which have duties consisting primarily of the enforcement of state laws or local ordinances, and may . . . limit or prohibit the right of employees in such positions or classes of positions to form, join or participate in employee organizations where it is in the public interest to do so; however, the governing body may not prohibit the right of its employees who are full-time 'peace officers . . .' to join or participate in employee organizations which are composed solely of such peace officers, which concern themselves solely and exclusively with the wages, hours, working conditions, welfare programs, advancement of the academic and vocational training in furtherance of the police profession, and which are not subordinate to any other organization.

"The right of employees to form, join and participate in the activities of employee organizations shall not be restricted by a public agency on any grounds other than those set forth in this section."

842, 384 P.2d 170]; *International Assn. of Fire Fighters* v. *County of Merced* (1962) 204 Cal.App.2d 387, 391-392 [22 Cal.Rptr. 270].)

In addition to ensuring a public employee's right to engage in a wide range of union-related activities without fear of sanction, the Meyers-Milias-Brown Act defines the *scope* of the employee's right to union representation in language that is broad and generous.

Section 3503 establishes the right of recognized employee unions directly to represent their members in "employment relations with public agencies."[7] This right to representation reaches *"all* matters of employer-employee relations," (Gov. Code, § 3502; italics added) and encompasses "but [is] not limited to, wages, hours, and other terms and conditions of employment" (Gov. Code, § 3504).

The narrow question presented in the instant case is whether this broadly defined right of representation attaches to an employer-conducted interview which an employee reasonably anticipates may involve his union activities and reasonably fears may ultimately lead to disciplinary action because of such union-related conduct. For the reasons discussed hereafter, we hold that the right of union representation does apply under these circumstances.

Over the lengthy history of governmental regulation of employee-management relations, the inherent threat to union activism posed by employer interrogation has been well documented. Scores of judicial decisions, on both the state and federal levels, attest to the potentially coercive and intimidating effect of employer inquiries into an individual employee's union activities. (See, e.g., *Petri Cleaners, Inc.* v. *Automotive Employees, etc., Local No. 88* (1960) 53 Cal.2d 455, 460, 462 [2 Cal.Rptr. 470, 349 P.2d 76]; *Graber Mfg. Co., Inc.* (1955) 111 N.L.R.B. 167, 168-169 [35 L.R.R.M. 1435]; *A. L. Gilbert Co.* (1954) 110 N.L.R.B. 2067, 2071-2072 [35 L.R.R.M. 1314].) Even when an employer presents an entirely "innocent" motive for such a questioning session, because of the normal tension between management and union and the interview's connection with union matters, the questioned employee is likely to view the employer's inquiries as directed at or arising out of his union activity, and the employee will frequently, and understandably, assume that such question-

---

[7]In *Professional Fire Fighters, Inc.* v. *City of Los Angeles* (1963) 60 Cal.2d 276, 283-284 [32 Cal.Rptr. 830, 384 P.2d 158], we upheld the right of a public employee union to bring suit in its own capacity to enforce the employment rights of its members.

ing sessions can be avoided in the future by curtailing his participation in union activities.

In light of the inherently coercive nature of such questioning sessions, numerous cases have imposed limitations on the employer's right to carry out such investigation into union activity generally (see, e.g., *Hendrix Manufacturing Company* v. *N.L.R.B.* (5th Cir. 1963) 321 F.2d 100, 104; *N.L.R.B.* v. *United Wire and Supply Corporation* (1st Cir. 1962) 312 F.2d 11, 13; *Blue Flash Express, Inc.* (1954) 109 N.L.R.B. 591, 594) and, in particular, have found improper coercive inquiries directed at an employee's attendance at union meetings or rallies. (See, e.g., *Crawford Manufacturing Co.* v. *N.L.R.B.* (4th Cir. 1967) 386 F.2d 367, 370; *N.L.R.B.* v. *Western Meat Packers, Inc.* (10th Cir. 1966) 368 F.2d 65, 67; *Weston & Brooker Co.* (1965) 154 N.L.R.B. 747, 751, enforced (4th Cir. 1967) 373 F.2d 741 [55 L.C. ¶ 11,790]; *May Aluminum, Inc.* (1965) 153 N.L.R.B. 26, 29, enforced (5th Cir. 1967) 379 F.2d 838 [55 L.C. ¶ 11,897].)[8]

In the instant case, of course, the employer possessed what appears to be a legitimate reason for inquiring into its employee's method of transportation to the union rally, and the union does not contend that the employer's questioning session, in itself, was improper or discriminatory. (Cf. *Blue Flash Express, Inc.* (1954) 109 N.L.R.B. 591.) Nevertheless, such an interview, touching as it did upon the employee's participation in a union activity, contained the inherent potential for intimidation and coercion noted above and, in our view, justified the employee's request for the presence of a union representative under the applicable, broad statutory provisions.

Recognition of the right to union representation in this setting is vital for several reasons. First, from the point of view of the questioned employee, the presence of a union representative will help assure the employee that he will not be penalized for his union activities and will tend to reduce

---

[8]In *N.L.R.B.* v. *Ralph Printing and Lithographing Company* (8th Cir. 1967) 379 F.2d 687, 691, the Eighth Circuit condemned the employer's compilation of a list of employees attending a union meeting, explaining that such a list would inevitably create "the clear impression that [the employer] was keeping its employees' union activities under surveillance. An impression of surveillance might well instill in the employee a fear of reprisal from the employer. Such conduct is violative of Section 8(a)(1) [of the National Labor Relations Act] as it could inhibit the right of employees to pursue their union activities untrammeled by the fear of possible employer economic coercion or other forms of retaliation."

the potentially coercive atmosphere of the employer-directed interview. Second, the union itself, of course, has a considerable interest in assuring that no sanctions, blatant or subtle, are meted out by the employer on account of an individual member's participation in union affairs. Finally, the union and its members have an additional, more generalized interest in guaranteeing that the employer does not adopt any new employment policies which, in application, tend to discriminate against union members or their activities. Thus, for example, in the instant case a union representative present at the interview might have protested an attempt by the employer to discriminatorily resurrect a generally unenforced rule concerning the noon hour use of county cars simply because of a connection here with union activities.[9]

In light of these considerations, we now hold that a public employee's right to union representation under section 3504 attaches to an employer-employee interview which an employee reasonably fears may investigate and sanction his union-related activities.[10]

The respondent county suggests, however, that the recognition of an employee's right to union representation under the circumstances of the instant case is inconsistent with several recent federal decisions interpreting similar "right to representation" provisions of the federal Labor Management Relations Act (29 U.S.C. §§ 157, 158 (a), 158 (d)).[11]

[9]Although the present record is inadequate to evaluate any contention of discriminatory application of the county's rule on use of county cars, it is noteworthy that the county itself focussed on the use of the cars to attend a union rally in its "warning" letter sent to three employees. (See fn. 1.) The letter declares that "it was not reasonable for [the employee] to assume that utilization of county equipment for transportation *in connection with an employee organizational activity was permissible.*" (Italics added.)

[10]Respondents cite two California decisions in support of their contention that public employees possess no statutory right to union representation in disciplinary matters; neither controls here. *Board of Education* v. *Cooper* (1955) 136 Cal.App. 2d 513 [289 P.2d 80], involved a teacher dismissed for his refusal to answer questions propounded to him under oath during an investigation of his alleged Communist Party affiliations; dictum in the opinion of the Court of Appeal stated that an employee enjoys no right to *counsel* when questioned by his employer, but that language does not apply in the instant case involving a claim of the right to *union* representation under a statute establishing the right of public employees to organize.

*Torrance Education Assn.* v. *Board of Education* (1971) 21 Cal.App.3d 589 [98 Cal.Rptr. 639], also relied upon by respondent, held merely that the Winton Act (Ed. Code, § 13080 et seq.) does not prohibit school administrators from requiring teacher attendance at faculty meetings while barring union officials; the case did not involve the right to union representation during a confrontation with an employer which an employee reasonably anticipates will involve union activities.

[11]29 United States Code section 157, provides that "[e]mployees shall have the right to self organization, to form, join, or assist labor organizations, to bargain

Although we agree with respondent's suggestion that the interpretation of the analogous provisions of the federal act is relevant to our present. decision, as we shall explain we find nothing in the recent federal cases which conflicts with the conclusions we have reached above.

Federal labor relation legislation has, of course, frequently been the prototype for California labor enactments, and, accordingly, in the past we have often looked to federal law for guidance in interpreting state provisions whose language parallels that of the federal statutes. (See, e.g., *Englund* v. *Chavez* (1972) 8 Cal.3d 572, 589-590 [105 Cal.Rptr. 521, 504 P.2d 457]; *Petri Cleaners, Inc.* v. *Automotive Employees, etc., Local No. 88* (1960) 53 Cal.2d 455, 459 [2 Cal.Rptr. 470, 349 P.2d 76].) Unquestionably, in defining the scope of representation in section 3504, the Legislature relied heavily upon the analogous sections of the federal Labor Management Relations Act; as one commentator has noted: "[t]he phrase 'wages, hours, and other terms and conditions of employment' [of section 3504] is taken verbatim from the LMRA, where it has been given a generous interpretation, including almost anything that might affect an employee in his employment relationship." (Grodin, *Public Employee Bargaining in California: The Meyers-Milias-Brown Act in the Courts* (1972) 23 Hastings L.J. 719, 749; fns. omitted.)[12] Professor Grodin additionally observes, however, that "[t]he phrasing of the first part of section 3504 [i.e., 'including *but not limited to*'] suggests the scope of representation under the [Myers-Milias-Brown] Act is even more broad" than under the federal statute (*id.*); thus, while the federal authorities undoubtedly provide a useful starting point in interpreting the scope of our state provision, they do not necessarily establish the limits of California public employees' representational rights.

In the instant case, however, we need not probe the area in which the state provision extends the right of representation beyond federal law, be-

---

collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. . . ." Section 158, subdivision (a) (1) makes it an unfair labor practice to interfere with the exercise of these rights, and section 158 subdivision (d) defines the scope of collective bargaining as "the mutual obligation . . . to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment. . . ."

[12]At least one Court of Appeal has already invoked federal law precedents in support of its construction of the Meyers-Milias-Brown Act. (*Service Employees' Internat. Union, Local No. 22* v. *Roseville Community Hosp.* (1972) 24 Cal.App.3d 400, 408-409 [101 Cal.Rptr. 69].)

cause the two recent federal decisions relied on by the county to support its position that no representational rights attached in the instant case are clearly distinguishable from the instant matter. In *N.L.R.B.* v. *Quality Manufacturing Company* (4th Cir. 1973) 481 F.2d 1018 [83 L.R.R.M. 2817] and *Mobil Oil Corporation* v. *N.L.R.B.* (7th Cir. 1973) 482 F.2d 842 [83 L.R.R.M. 2823], the respective Circuit Courts of Appeals refused to enforce a National Labor Relations Board rule which recognized the right of an employee to have a union representative present at *any* employer-employee interview when the employee reasonably anticipated that disciplinary action might result from the interview.[13]

Neither *Quality Manufacturing* nor *Mobil Oil* are applicable to the instant case, however, for in neither decision did the employer-employee interview arise under circumstances in which the employee could reasonably fear that the questioning would relate to his union activities. Indeed the *Mobil Oil* court was careful to note explicitly that the circumstances before it did not involve such potential interrogation of union activities, emphasizing that "this is not a case in which there is any danger that the questioning was actually motivated by a desire to impair the employees' right to organize, to detect Union activity, or in any way to influence collective bargaining negotiations." (482 F.2d at p. 845 [83 L.R.R.M. at p. 2825]; see *Dobbs Houses, Inc.* (1964) 145 N.L.R.B. 1565, 1571 [55 L.R.R.M. 1218].)

In sum, the employer's investigation here did not constitute a normal interview with regard to employment matters but, instead, an inquiry that focused upon the employee's conduct regarding the use of county cars in connection with a union rally. The very lifeblood of the union is its meetings and rallies; without them, the union expires. An inquiry into this subject matter, with its overtones of discipline of union members who attended the rally, could only create fear on the part of those subject to the process and lead them to urge the reasonable request that a union representative be present to assist them.

The judgment of the superior court is affirmed with respect to appellants

---

[13]The National Labor Relations Board adopted its interpretation of the scope of the federal act's "right to representation" provision in a recent en banc decision. (See *Weingarten Inc. & Retail Clerks Union, Local Union No. 445, Retail Clerks International Association AFL-CIO* (Mar. 16, 1973) 202 N.L.R.B. No. 69 (en banc) [1973 C.C.H. N.L.R.B. ¶ 25, 151].) Although the two recent judicial decisions cited above did not concur in the agency's interpretation of the federal act, to date the board has not acquiesced in the judicial rulings, and thus the cited cases are only authoritative precedent in the circuits from which they arose. Accordingly, the state of the federal law in this area remains unsettled.

Doyle, Pofscher and Chan. With respect to the remaining appellants the judgment is reversed and the cause remanded to the superior court for proceedings consistent with this opinion.

Wright, C. J., Mosk, J., Burke, J., Sullivan, J., and Clark, J., concurred.

**McCOMB, J.**—I dissent. I would affirm the judgment for the reasons expressed by Mr. Justice Kane in the opinion prepared by him for the Court of Appeal in *Social Workers' Union Local 535* v. *Alameda County Welfare Dept.* (Cal.App.) 106 Cal.Rptr. 609.