Filed 9/7/22

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| COUNTY OF SAN JOAQUIN, | C094069 |
| Petitioner, | (Case No. SACE1141M) |
| v. | |
| PUBLIC EMPLOYMENT RELATIONS BOARD, | |
| Respondent; | |
| CALIFORNIA NURSES ASSOCIATION, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDING:  petition for writ of review.

Sloan Sakai Yeung & Wong, Jeff Sloan, Justin Otto Sceva, and Madeline Miller for Petitioner.

J. Felix De La Torre, Wendi L. Ross, Joseph W. Eckhart, and Brendan P. White, for Respondent.

Weinberg, Roger & Rosenfeld, Kerianne R. Steele and Corey T. Kniss for Service Employees International Union, Local 1021, as Amicus Curiae on behalf of Respondent.

Nicole J. Daro, Eric J. Wiesner, and Anthony J. Tucci, for Real Party in Interest.

Leonard Carder, Arthur Liou and Julia Lum for American Federation of State, County and Municipal Employees, Local 3299; University Professional and Technical Employees, Communication Workers of America, Local 9119 on behalf of Respondent and Real Party in Interest.

1

The County of San Joaquin (County) filed a petition for writ of review relief in this court following a decision of the Public Employment Relations Board (Board), in which the Board found the County interfered with and discriminated against the protected activity of the California Nurses Association (Nurses) and its registered nurse members (members). Specifically, the Board found the County's policy prohibiting members from returning to work after a noticed strike based on the County's contract with a strike replacement company containing a minimum shift guarantee for replacement workers was conduct inherently destructive to protected activity. The Board then announced and applied a new test providing for a defense to the County's conduct of threatening and implementing the policy and determined the County could not meet the standard set forth in the test. The Board also found the County's refusal to permit members from using accrued leave for the time the members were prohibited from returning to work and the County's determination the absences were unauthorized, thereby subjecting members to discipline, was conduct inherently destructive to protected activity. Accordingly, the Board ordered several remedies, including that the County allow members to use accrued leave for the time they were prohibited from returning to work and for similar absences in the future.

We granted the County's petition for writ of review relief and issued a writ of review. The County challenges several of the Board's legal, factual, and remedial findings. After considering all of the briefs filed in this case, we affirm the Board's decision in all respects.

FACTUAL AND PROCEDURAL BACKGROUND

I

*The Strike*

The County is a public agency within the meaning of the Meyers-Milias-Brown Act (Gov. Code,[1] § 3500 et seq.) (Act) and the Board's regulations. As one of its functions, the County operates the San Joaquin General Hospital (Hospital). The Hospital is a general

---

[1] Undesignated section references are to the Government Code.

acute care hospital that includes an emergency department, a neonatal intensive care unit, and the County's only trauma center. The Hospital serves more indigent patients than any other hospital in the County and provides inpatient care to incarcerated patients in secure wards. The County also operates outpatient clinics in other locations within the County's boundaries. In the first half of the 2019 to 2020 fiscal year, the Hospital lost substantially more money than expected. Nurses is an employee organization within the meaning of the Act and the exclusive representative of a bargaining unit comprised of more than 700 members working at the Hospital and clinics within the County's boundaries.

The County and Nurses were involved in prolonged labor negotiations to bargain for a successor agreement to the memorandum of understanding between them. Between June and August 2019, the County sought proposals from three companies to provide replacement workers in the event of a strike. In October 2019, the County entered into a contract with Healthsource Global Staffing (Healthsource) to provide replacement workers in the event of a strike by Nurses and/or by Service Employees International Union Local 1021 (Service Employees Union), which represented technical workers and other employees of the Hospital. As part of the strike replacement contract, the County agreed to " 'a minimum of what amounts to five (5) twelve-hour shifts (60 hours) for each Replacement Staff that commences travel to the Destination City. . . .' " Further, " '[o]rientation provided to the Replacement Staff [was] billed at applicable Compensation Fee rates and [did] not count toward this minimum number of billable hours.' "[2]

In January 2020, the County and Nurses reached an impasse in bargaining for a new memorandum of understanding, and postimpasse mediation did not resolve the impasse. Thus, on February 24, 2020, Nurses notified the County of its intention to strike at 7:00 a.m. on March 5, 2020, until 6:59 a.m. on March 7, 2020.

---

[2] Further details pertaining to the County's negotiations of this contract will be recounted *post*.

Thereafter, the County filed an unfair practice charge and request for injunctive relief with the Board against Nurses to enjoin essential employees from striking. Following mediation, Nurses and the County entered into a settlement agreement on February 28, 2020, whereby Nurses exempted multiple members from participating in the strike because those members were essential to delivering health care services. In advance of the strike, the County canceled some elective surgeries and outpatient clinic visits, reduced its intake of trauma patients, and otherwise reduced its overall number of patients. The County also learned that many employees represented by the Service Employees Union would strike in sympathy with Nurses.

On March 3, 2020, the chief executive officer of the Hospital, David Culberson (Culberson), asked the San Joaquin County Board of Supervisors to retroactively approve the contract with Healthsource and the allocation of $4 million for replacement workers. The San Joaquin County Board of Supervisors approved Culberson's request.

On March 4, 2020, Culberson, sent a memorandum to "all [Nurses] Unit Members" regarding the date striking members could return to work (Culberson memo). The Culberson memo informed striking members that to ensure the County's ability to deliver "necessary health services without interruption, including emergency services, the County has contracted with an outside company for replacement workers during the strike period. The company with which the County has contracted, however, will only agree to provide such replacement workers for a full five day period, and the County has therefore been forced to agree to pay a minimum of five full days for such workers[.] [¶] Given this unavoidable commitment, please know that [Nurses] unit members who participate in the strike will <u>not</u> be able to return to work at the end of the strike period as noticed by [Nurses]. Instead, such **participating employees will not be accepted back at work until their first shift on or after Tuesday, March 10 at 7 a.m., unless called into work at an earlier time by [the Hospital] management.**"

4

The Culberson memo also informed striking members they might be notified not to return to work because of low patient census, at which time members would be furloughed pursuant to the memorandum of understanding between the County and Nurses.

The memorandum of understanding between the County and Nurses sets forth furlough procedures in the event of "[f]luctuations in patient census" to accommodate "lower staffing needs." In such an event, "the Hospital Director or designee may furlough any regular or contract employee . . . for up to thirty six (36) hours during any fiscal year," subject to certain conditions. Enumerated as part of those conditions is that the Hospital "will make every attempt to seek volunteers before imposing mandatory furloughs" and employees will be called off in a particular order related to their employment status. Further, "[i]f an employee is notified that he or she is being furloughed and is then asked to report to work for the same shift, the employee will be guaranteed a full shift whether or not the employee works a full shift. Such an employee may not be ordered to return to work, and not required to be available if called." Finally, "[members] who are furloughed may use up to 24 hours of vacation, compensatory time off or holiday hours to equal a full shift's pay."

On March 5, 2020, the strike began. During the strike, and for three days after the strike, the County maintained a lower patient census, such that the number of patients was reduced from 150 patients to 120 patients. During the strike, the County continued to operate the Hospital by using Healthsource replacement workers, traveling or registered nurses already contracted to work for the County before the strike, supervisors and managers, and two categories of members -- those who were exempted from the strike pursuant to the settlement agreement and those who chose to work during the strike. The County did not have sufficient notice to hire replacements for employees represented by the Service Employees Union who chose to participate in a sympathy strike; however, the County was able to cover the sympathy strikers' shifts by using Healthsource replacement

5

workers, supervisory personnel, and nonstriking employees represented by the Service Employees Union and Nurses.

On March 7, 2020, the strike ended, and members attempted to return to work.[3] Between March 7 and March 9, 2020, the County continued to employ Healthsource replacement workers and barred most members who participated in the strike from returning to work. The County did not bar any employees represented by the Service Employees Union from returning to work. During this time, Nurses and multiple members believed the County had furloughed members under the memorandum of understanding, leading some members to claim vacation, compensatory time off, or holiday hours for the time they were barred from returning to work. Ultimately, the County determined members had not been furloughed under the memorandum of understanding and instead the County marked on members' time cards that the leave was unauthorized. During the three days after the strike, when most members were barred from returning to work, the County attempted to call back to work some barred members due to understaffing. Many of the members who were called back refused to return to work, invoking the provision of the memorandum of understanding that permitted furloughed members to refuse callback requests.

On April 9, 2020, Nurses filed a statement of amended charge with the Board against the County. On May 18, 2020, the Board issued a complaint against the County. The complaint alleged that on March 5 and 6, 2020, members exercised rights guaranteed by the Act by participating in a two-day strike. The complaint further alleged the County took adverse action against Nurses and its striking members which constituted discrimination against and interference with protected conduct, as well as a unilateral change in policies contained in the memorandum of understanding related to the furlough procedures. In its

---

[3]     Further details pertaining to members' efforts to return to work will be recounted *post*.

6

answer, the County denied its conduct amounted to adverse actions and raised several affirmative defenses to the allegations.

II

*The Administrative Hearing*

A

*Contract Negotiations*

Chief nursing officer Belva Snyder testified at the administrative hearing on behalf of the County regarding the process she and her team undertook when selecting a strike replacement company. Snyder testified she had limited experience with strikes; specifically, she had been a hospital administrator during a threatened strike that had never materialized. As it pertained to the successive memorandum of understanding between the County and Nurses, Snyder was part of the County's negotiating team and was present during negotiation sessions. By June 2019, the County and Nurses had been negotiating for quite some time and each party had brought very different proposals to the table without any resolution. Thus, in June 2019, Snyder started preparing for an anticipated strike by researching strike replacement companies. She had her team contact three companies -- Maxim, Autumn, and Healthsource. In Snyder's experience, the County preferred multiple proposals (typically, at least three) before contracting with any given company. Snyder did not contact any other strike replacement company and was unaware of any other companies in the field.

As it pertained to Snyder's search for a strike replacement company, Snyder wanted to find a company that would be able to provide the diversity and number of employees necessary to replace both the Service Employees Union and Nurses in the event the unions held a strike at the same time. She also wanted a vendor that was fiscally reasonable considering the "organization's financial situation." Further, Snyder wanted the replacement workers to have the skill sets needed to replace the various members in the different departments of the Hospital. It was Snyder's understanding she would orient

7

replacement workers to the Hospital's facility and procedures, but not to train them regarding patient care.

The County had a current and long-standing contract with Maxim, a company that provided traveling nurses and was not a strike replacement company. Traveling nurses are typically used to fill vacancies while recruiting for permanent replacements or if there is a surge in patient census. Snyder removed Maxim from consideration early in the process because it could not provide replacements for employees represented by the Service Employees Union and because the Hospital was already having trouble with Maxim providing sufficient staffing for traveling nurse positions. Maxim did, however, submit a proposal to the County and required a minimum shift guarantee for its replacement workers of 48 hours, or four shifts of 12 hours, for each replacement nurse in the event of a two-day strike.

Snyder and her team also contacted Autumn. Autumn offered a minimum shift guarantee of 48 hours for a two-day strike as well. Autumn submitted a proposal indicating that for each nurse ordered through their service, the County would be assessed a $1,200 charge. Then, the County would be charged anywhere from $145 to $180 per hour for each replacement nurse. Snyder decided not to enter a contract for Autumn's services because it was too expensive and because she had never worked with Autumn, making her uncertain about the level of service it could provide.

Finally, Snyder and her team contacted Healthsource, with whom the County had a prior relationship during a threatened 2016 Nurses' strike. While the 2016 strike never materialized, the County looked favorably on its interactions with Healthsource. Snyder was not yet an employee of the County at the time of the threatened 2016 strike, but she relied on the assertions of other Hospital staff that Healthsource had a good reputation. In Snyder's conversations with Healthsource representatives, the representatives were confident they could provide the needed replacement workers for members of Nurses and for employees represented by the Service Employees Union. Healthsource charged $400

8

per replacement worker ordered, which it was able to do because the County signed a contract with it early in the strike preparation process. Healthsource required each replacement nurse to work a minimum of 60 hours, or five 12-hour shifts, for a two-day strike and receive one day of orientation not included as part of the minimum shift guarantee. Healthsource charged between $118 and $125 per hour for each replacement nurse. Snyder decided to enter a contract with Healthsource because it was overall less expensive than Autumn, Healthsource could confidently provide the broad range of replacement workers requested, and the County had a prior favorable experience with Healthsource.

After deciding to enter a contract with Healthsource, Snyder negotiated the substance of the contract and became aware of several things. First, Healthsource's minimum shift guarantee of 60 hours was a standard term in its contracts for two-day strikes. She was told this when she verbally inquired whether Healthsource could lower the 60-hour minimum. She did not ask about the minimum in writing or try to negotiate the term beyond being told it was a standard contract term. Snyder was not aware that Healthsource had agreed to a lower minimum shift guarantee in a contract with another hospital. Second, Healthsource did not want its replacement workers to come into contact with members of the union they would be replacing. To that end, Healthsource required the County to orchestrate the arrival of the replacement workers. For example, when the replacement workers began work at the start of the strike, they entered the Hospital through the rear entrance and members were required to exit the Hospital through the front entrance. Healthsource made an exception to this rule to allow replacement workers to work alongside essential employees, i.e., members who were enjoined from striking pursuant to the settlement agreement. Third, Healthsource required the County to agree to an exclusivity provision, meaning only Healthsource would provide the strike replacement workers. Healthsource made an exception to this provision for traveling nurses supplied by Maxim.

9

The contract between the County and Healthsource was entered into at the end of October, at a time when Snyder did not know how long a potential strike would last. Before doing so, Snyder negotiated to lower the interest rate for late or delayed payments. During her administrative hearing testimony, Snyder could not recall whether she told Healthsource representatives she had inquired with other companies regarding strike replacement services.

Tabi Elbahou was vice president and general manager of Healthsource at the time it entered into the contract with the County. He did not recall the County attempting to negotiate over any term of the contract other than to lower the interest rate related to late or delayed payments, although most of the negotiations involved his employee and not him. Elbahou testified the County agreed to the standard contract language Healthsource offered, which included a term for a 60-hour minimum shift guarantee. Healthsource typically includes the provision so it can provide an aggressive and appealing compensation package for replacement workers and attract the right clinicians. To the best of Elbahou's knowledge, Healthsource had entered into contracts with other hospitals with lower minimum shift guarantees. He believed the lower minimums occurred when the strikes in question were predicted to last fewer than three days; however, when shown a contract with contrary language, Elbahou could not speak to the circumstances of that contract because it was before he was employed with Healthsource. Elbahou testified that clients had tried to negotiate lower minimum shift guarantees, but no testimony was given pertaining to the outcome of those negotiations.

B

*Poststrike Return To Work*

Following the two-day strike, members attempted to return to work for the morning shifts on March 7, 2020. Culberson, along with the Hospital's security team, blocked members from entering the Hospital. Culberson testified at the administrative hearing that he told members shifts were adequately staffed, and they were not needed, except for a few

members who were permitted to return to work. Employees represented by the Service Employees Union, on the other hand, were all permitted to return to work because Healthsource replacement workers were not filling their positions. This was because the Service Employees Union did not provide notice of its sympathy strike, thus Healthsource could not prepare or deploy replacement workers for those striking employees.

Members asked Culberson whether he was furloughing them under the memorandum of understanding. Culberson referred members to the Culberson memo. It was Nurses' and members' understanding that members were being furloughed under the memorandum of understanding. Culberson testified he was not clear about the reason members were being ordered not to return to work and may have misspoke when speaking about the reasons members were prohibited from returning to work. Culberson testified he never told members they were not being furloughed under the memorandum of understanding.

Snyder testified it was her understanding the Culberson memo told striking members they could not return to work because of the replacement workers and would possibly be prevented from returning to work following the five-day period replacement workers were at the Hospital because of low patient census. The decision to prevent members from returning to work for the full five days replacement workers were contracted to work was a financial decision because the County could not afford to have double staffing at the Hospital. Snyder testified members were told they may be needed in the three-day period after the strike while replacement staff was present because patient census could increase or the Hospital could need members' expertise. In that event, Snyder testified, the Culberson memo informed members they would be called into work.

In the three days following the strike, Snyder determined she needed more nursing staff in addition to the Healthsource replacement workers, essential employees, and traveling nurses, which Healthsource allowed to continue working during its contract term with the County. Indeed, the County had contracts with multiple traveling nurse companies at the time of the strike and three-day overlap period. One reason staff was needed was

11

because essential employees enjoined from striking were not enjoined after the noticed strike and could no longer be forced to work. Based on the determination that additional nursing staff was needed, Snyder called multiple members to return to work. Many of those members refused to return to work believing they could refuse under the furlough provision of the memorandum of understanding. Snyder testified that, when calling staff to return to work, she called nurses who possessed the skills to replace the essential employees who were no longer compelled to work pursuant to the settlement agreement between Nurses and the County. Thus, in the event she called a traveling nurse instead of a member, it was because the traveling nurse possessed the skills necessary to replace an essential worker.

When filling out time cards, members attempted to use accrued leave for the three days following the strike. The County denied members' attempts to use accrued leave and instead marked the leave as unauthorized. This was true regardless of whether the member refused to return to work and applied to all members who had a shift scheduled for the days following the strike when members were barred from returning to work. The County decided not to honor members' accrued leave requests because it would result in the County paying two sets of staff. Members who were scheduled to be on standby were paid as standby employees for the three days following the strike.

Unauthorized leave means a member was not present for work when scheduled to work and the time card notation can be used as a basis for discipline. Because the leave was unauthorized, some members did not accrue enough working time within the pay period to entitle them to vacation or retirement benefits and their longevity pay raises were delayed.

III

*The Board's Decision*

The Board issued its decision on April 12, 2021. The Board dismissed the unilateral change claim alleged in the complaint, but concluded the County violated the Act and Board regulations by discriminating against and interfering with Nurses' and members' protected striking activity. To come to this conclusion, the Board applied the "well-established

12

interference and discrimination standards" to several adverse actions taken by the County. These adverse actions were the County's conduct of "threatening to disallow strikers from work for multiple days after the strike, implementing that action, refusing to allow nurses to use paid time off for the period following the strike in which they were barred from work, and designating employees' strike time and time following the strike as [unauthorized leave]."[4]

The Board concluded the first two adverse actions pertaining to the County's policy to disallow striking members from returning to work for multiple days after the strike amounted to conduct that was inherently destructive to protected striking activity. The Board then recognized it had adopted the affirmative defense framework governing private sector employers announced in *NLRB v. Great Dane Trailers, Inc.* (1967) 388 U.S. 26 [18 L.Ed.2d 1027] (*Great Dane*) to both interference and discrimination cases involving public employers. The Board explained that it was applying this framework to the unique set of facts pertaining to the County's inherently destructive conduct. When applying this standard, the Board reviewed "[f]ederal decisions [that] have repeatedly considered strike replacement contracts with minimum [shift] guarantee provisions and, in a parallel line of cases, partial lockouts featuring alleged discrimination against protected activity. [It determined, t]hese decisions lay out neither a consistent analytic framework nor an approach [the Board] f[ou]nd fully persuasive in interpreting the [Act]."

Thus, the Board formed a three-part test under which a public health care employer that prohibits bargaining unit employees from work after a strike due to a minimum shift guarantee for strike replacement workers could typically establish an affirmative defense. The test requires a public health care employer to "prove that: (1) it made a good faith

---

[4] The County later decided not to enforce the unauthorized leave designation as a basis for discipline. The Board did not consider this a retraction of the adverse action because the County's decision occurred five months after the initial conduct, making the decision untimely, and thus failing to meet the legal standard of a retraction.

13

effort in the marketplace to negotiate a strike replacement contract that would eliminate any minimum shift guarantee or shorten it to the greatest degree possible, but it ultimately needed to agree to the minimum shift guarantee in order to maintain critical health care services; (2) it barred employees from work only because such a contractual commitment temporarily reduced available work opportunities, and it filled all remaining opportunities without discriminating against employees based on whether they worked during the strike or engaged in any other actual or perceived protected activity; and (3) it provided the employees' union with timely notice regarding any decision to guarantee replacement workers a minimum work period or to modify the terms of such a guarantee, and if requested, bargained in good faith over the potential effects on bargaining unit employees."

Applying this test, the Board found the County could not avail itself of the affirmative defense because it did not establish that it made a good faith effort to eliminate the minimum shift guarantee or shorten it to the greatest degree possible, it granted preference to members who did not strike when determining who worked after the strike, and it failed to provide Nurses with adequate notice of Healthsource's contracted minimum shift guarantee.

The Board then analyzed whether the County interfered or discriminated against protected rights when it refused to allow members to use paid leave for the period after the strike or when designating the time during which they were barred from returning to work as unauthorized leave. The Board determined the County did interfere with and discriminate against protected activity and the County could not avail itself of the affirmative defense outlined in *Great Dane* under either the inherently destructive standard or the less burdensome comparatively slight standard because the County could not justify its conduct with a valid business reason.

As a result of the Board's findings, it determined the appropriate remedy was to permit members to use paid leave for the period after the strike, even if members refused to return to work when called to return. The Board found that while members were not

furloughed due to low patient census under the memorandum of understanding, members were reasonably confused given Culberson's statements, and members understandably asserted rights under the memorandum of understanding to not return to work. Given the policy that remedial orders should make injured parties whole and deter future interference and discrimination, the Board found it necessary to order the County to allow members to use accrued leave for the three days they were barred from work. The Board further ordered, "[u]nless the parties agree otherwise, [the County was to] permit [members] to use paid leave time for furloughs occasioned by a minimum shift guarantee in a strike replacement contract to the same extent as is permitted for furloughs resulting from reduced patient census or other business reasons."

The County filed a petition for writ of review relief in this court. We granted the petition and issued a writ of review.

DISCUSSION

I

*The Act And Applicable Board Standards*

It is the express purpose of the Act "to promote full communication between public employers and their employees by providing a reasonable method of resolving disputes regarding wages, hours, and other terms and conditions of employment between public employers and public employee organizations." (§ 3500.) Section 3506 provides: "Public agencies and employee organizations shall not interfere with, intimidate, restrain, coerce or discriminate against public employees because of their exercise of their rights under Section 3502." Section 3502 provides in relevant part: "Except as otherwise provided by the Legislature, public employees shall have the right to form, join, and participate in the activities of employee organizations of their own choosing for the purpose of representation on all matters of employer-employee relations."

Section 3506.5, subdivision (a), similarly makes it unlawful for a public agency to "[i]mpose or threaten to impose reprisals on employees, to discriminate or threaten to

15

discriminate against employees, or otherwise to interfere with, restrain, or coerce employees because of their exercise of rights guaranteed by [the Act]," while subdivision (b) of the same section makes it unlawful for a public agency to "[d]eny to employee organizations the rights guaranteed to them by [the Act]," including the right of recognized employee organizations "to represent their members in their employment relations with public agencies." (§ 3503; *Los Angeles County Employees Assn. v. County of Los Angeles* (1985) 168 Cal.App.3d 683, 687; *County of Riverside* (2010) PERB Dec. No. 2119-M at pp. 20-21, 23 [34 PERC ¶ 108].)

The Act parallels the National Labor Relations Act (29 U.S.C. § 151 et seq.), and when interpreting the Act, it is proper to look to federal authority for its persuasive value. (*Social Workers' Union, Local 535 v. Alameda County Welfare Dept.* (1974) 11 Cal.3d 382, 391; *Vernon Fire Fighters v. City of Vernon* (1980) 107 Cal.App.3d 802, 815.) Over the years, the Board and California's courts have developed several tests for analyzing allegations arising under the above provisions of the Act and the virtually identical language of other Board-administered statutes. (See, e.g., *Campbell Municipal Employees Assn. v. City of Campbell* (1982) 131 Cal.App.3d 416, 424-425; *Los Angeles County Superior Court* (2018) PERB Dec. No. 2566-C at p. 15 [43 PERC ¶ 1]; *Novato Unified School District* (1982) PERB Dec. No. 0210-E at pp. 3-7 [6 PERC ¶ 13114]; *Carlsbad Unified School District* (1979) PERB Dec. No. 0089-E at pp. 10-11 [3 PERC ¶ 10031] (*Carlsbad*).) Broadly speaking, the various conduct proscribed by sections 3506 and 3506.5 may be characterized as either interference or discrimination. (*Los Angeles Superior Court*, at pp. 24-25, fn. 17.)

When a charging party has established a prima facie case of interference or discrimination, the burden shifts to the employer to prove an affirmative defense.[5] (*Great*

---

[5] The County does not dispute that Nurses established a prima facie case of interference and discrimination as to its adverse actions of threatening and then

16

*Dane*, *supra*, 388 U.S. at pp. 33-34 [18 L.Ed.2d at pp. 1034-1035].)  The Board applies the same standard established in *Great Dane* for discrimination claims, but unlike *Great Dane*, the standard is applicable to both interference and discrimination claims.  (See *Campbell Municipal Employees Assn. v. City of Campbell*, *supra*, 131 Cal.App.3d at p. 423 [applying the affirmative defense announced in *Great Dane* to an interference claim].)  If the harm to employee rights is " ' "comparatively slight," ' " then the employer has the opportunity to provide evidence that its actions were motivated by legitimate and substantial business justifications.  (*Campbell*, at p. 424, citing *Great Dane*, at p. 34 [18 L.Ed.2d at p. 1035]; *Carlsbad*, *supra*, PERB Dec. No. 0089-E at pp. 10-11.)  If, on the other hand, the employer's conduct is " ' "inherently destructive" of important employee rights, no proof of antiunion motivation is needed . . . .' " (*Campbell*, at p. 423.)  In those instances, the employer's conduct will be excused only on proof that it was occasioned by circumstances beyond the employer's control and that no alternative course of action was available.  (*Carlsbad*, at pp. 10-11.)

II

*The Board's Legal Determinations Were Not Clearly Erroneous*[6]

The County raises several issues pertaining to the Board's legal determinations.  These claims can be divided into three main issues:  (1) the Board improperly determined the County's adverse actions of threatening and implementing a policy prohibiting striking members from returning to work following the strike amounted to inherently destructive

---

implementing a delayed return-to-work schedule based on the hiring of strike replacement workers with a minimum shift guarantee.

[6]     Because we conclude the Board's decision was not clearly erroneous insofar as it determined the County's refusal to allow striking members to return to work amounted to inherently destructive conduct and announced a new test applicable to public health care employers who utilize strike replacement services, we need not address the County's appellate claim it would have prevailed under a comparatively slight affirmative defense framework.

17

conduct; (2) the Board's newly announced test pertaining to contracts with strike replacement companies is illogical and not supported by Board precedent or federal authority; and (3) the Board improperly determined the County's failure to allow members to use paid leave for the three days following the strike interfered with and discriminated against protected activity.

When reviewing these claims, "[i]t is settled that '[c]ourts generally defer to [the Board]'s construction of labor law provisions within its jurisdiction.' " (*Boling v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 911.) " 'We follow [the Board]'s interpretation unless it is clearly erroneous.' " (*Id.* at p. 912; *County of Los Angeles v. Los Angeles County Employee Relations Com.* (2013) 56 Cal.4th 905, 922.) "[W]ithin [the Board]'s area of expertise, the deferential standard . . . applies to [the Board's] legal determinations even if based on undisputed facts." (*Boling*, at p. 913.)

A

*The Board's Determination The County's Delayed Return-To-Work*

*Policy For Striking Members Amounted To Inherently*

*Destructive Conduct Was Not Clearly Erroneous*

When analyzing the degree to which the County's conduct infringed on Nurses' and members' protected rights as it pertained to the interference claim, the Board reasoned: "Denying work opportunities following a strike significantly coerces protected rights by discouraging employees from authorizing future strikes, and therefore gives rise to a robust duty to narrowly tailor." As it pertained to the discrimination claim, the Board further stated: "if a hospital denied work opportunities to a greater degree for those who have engaged in protected activity, such conduct is facially discriminatory, and the significantly coercive impact rises to the level of inherently destructive."

The County contends this determination was clearly erroneous because the Board's analysis failed to distinguish between conduct that is inherently destructive as opposed to

18

inherently discriminatory, failed to comply with its own precedent, and unjustifiably rejected federal authority. We disagree.

The Board's stated reasons imply it believed the County's conduct was *not merely* discriminatory, but that the County's conduct resulted in a negative and prolonged impact on Nurses' willingness to strike as a means of bargaining in the future. Indeed, the Board pointed to the fact that the County's conduct discouraged *future* strikes. Although these reasons do not state a standard or grapple with the tension between the definitions of discriminatory and destructive conduct to the County's liking, the County has not directed us to any requirement the Board must first recite the rules it applies or engage in a specific analysis before announcing its determinations. To require the Board to do so would elevate form over substance and fall outside our review of whether the Board's legal determinations are clearly erroneous.

The County cites to *Berkeley* as stating the proper standard to apply when determining whether an employer's conduct was inherently destructive or comparatively slight. (*Regents of the University of California (Berkeley)* (2018) PERB Dec. No. 2610-H [43 PERC ¶ 100].) There, the *Berkeley* Board observed it had "never identified or explained what distinguishes comparatively slight harm from inherently destructive conduct." (*Berkeley*, at p. 58.) The *Berkeley* Board then considered several of its own decisions and National Labor Relation Board decisions. The *Berkeley* Board stated it defined inherently destructive conduct as the " 'natural and probable consequence' [of which] would be to discourage the exercise of [protected] rights" or "would tend to discourage both present and future protected activity." (*Berkeley*, at pp. 58, 59.) As to National Labor Relation Board decisions, the *Berkeley* Board observed federal authorities have defined inherently destructive conduct as that which "typically 'creat[es] visible and continuing obstacles to the future exercise of employee rights' or has 'far reaching effects which could hinder future bargaining.' " (*Berkeley*, at p. 86.) With this in mind, the *Berkeley* Board noted, the National Labor Relations Board and federal courts "consider the temporal impact or likely

19

duration of [the conduct's] effect on protected activity." (*Berkeley*, at p. 86.) Indeed, the National Labor Relations Board explained in *International Paper Company* "that, in evaluating the temporal impact on protected rights, both 'the severity of the harm suffered by the employees for exercising their rights' and 'the severity of the impact on the statutory right being exercised' should be considered." (*Berkeley*, at p. 87, quoting *Int'l Paper Co.* (1995) 319 NLRB 1253, 1269.)

The *Berkeley* Board pointed to several examples of inherently destructive conduct under both state and federal authority. These examples include: "conduct directed against a union officer, steward or other employee representative, *in his or her capacity as an employee representative*"; "employer speech . . . when it contains express or implied threats, when it is likely to discourage employees from seeking union assistance, from using the collectively-bargained grievance procedure, or from engaging in other protected conduct, or when it conveys the message that collective bargaining is futile"; "an employer's outright or facial ban on union or other protected activity in non-working areas and during non-working time"; "an employer's prohibition against union officers representing bargaining-unit employees in investigative meetings"; and "conditioning a pay increase on surrendering protected rights." (*Berkeley*, *supra*, PERB Dec. No. 2610-H at pp. 59, 60, 61, 87.)

Here, the Board considered the effect the County's conduct had on future protected activity and the severity of the County's conduct on striking members. The Board determined the County's conduct was "significantly coercive." The Board further found the County's conduct "discourag[ed] employees from authorizing *future* strikes." (Italics added.) Indeed, the County's conduct targeted only those members who participated in the strike, not those members who were exempt or crossed the picket line, whom the County permitted to work in the days following the strike without qualification. By targeting only striking members the night before the noticed strike with a delayed return-to-work schedule that more than doubled the length of the strike, the County demonstrated to Nurses and members that striking was not an effective means of bargaining, i.e., futile, because the

20

length of the strike and the consequences thereof were unavoidable and out of Nurses' and members' control. This is similar to many of the examples cited by the Board in *Berkeley*. (See *Berkeley*, *supra*, PERB Dec. No. 2610-H at pp. 59-61, 87.) Accordingly, the Board's determination complied with its precedent and was not clearly erroneous on this basis.

Similarly, the Board's finding the County engaged in inherently destructive conduct does not impermissibly deviate from federal authority. The County argues the Board ignored *Pacific Mutual Door Co.* (1986) 278 NLRB 854 (*Pacific Mutual Door*) and nearly every other subsequent National Labor Relations Board decision, finding employer conduct similar to that of the County's conduct was not inherently destructive. (Citing *Knightsbridge Heights Rehabilitation Care Center* (2008) 352 NLRB 6; *Sutter Roseville Medical Center* (2006) 348 NLRB 637; *AMI/HTI Tarzana-Encino Joint Venture d/b/a Encino Tarzana Regional Medical Center* (2000) 332 NLRB 914 (*Encino Tarzana*); *Harvey Mfg., Inc.* (1992) 309 NLRB 465.) But the Board addressed these federal decisions, ultimately finding them inadequate considering the realities of public sector labor relations.

The Board is permitted to depart from federal law when it supplies a reasoned basis particular to the context of California public sector labor law for doing so. (*McPherson v. Public Employment Relations Bd.* (1987) 189 Cal.App.3d 293, 307-308; see *Agricultural Labor Relations Bd. v. Superior Court* (1976) 16 Cal.3d 392, 412-413.) Further, while the Act parallels the National Labor Relations Act, federal authority is merely persuasive. (*Social Workers' Union, Local 535 v. Alameda County Welfare Dept.*, *supra*, 11 Cal.3d at p. 391; *Vernon Fire Fighters v. City of Vernon*, *supra*, 107 Cal.App.3d at p. 815.)

Here, the Board diverged from federal authority given the differences between the public employment relationships governed under the Act and the private employment relationships governed under the National Labor Relations Act. Specifically, the Board reasoned "[e]mployers and unions under our jurisdiction each face stricter limits on their use of economic weapons than the restrictions governing their private sector counterparts. For instance, it is an unfair practice for a public sector union strike to cause an imminent and

21

substantial threat to the public's health or safety, and a union may lawfully strike pre-impasse only based upon employer unfair practices. [Citations.] Employers, for their part, cannot lock out employees or permanently replace strikers, among other restrictions. [Citation.] These principles not only make inapposite private sector caselaw allowing an employer to disfavor strikers if it has made permanent new arrangements during an economic strike, but also aid us in discerning the boundaries that apply to the County's conduct, which bears characteristics akin to a lockout."

The County argues these grounds are insufficient to justify the Board's characterization of its conduct as inherently destructive as opposed to comparatively slight because there is no link between the stricter limits the Board has imposed in the past and the County's conduct here. Not so. The Board "bring[s] expertise and uniformity to the delicate task of stabilizing labor relations." (*San Diego Teachers Assn. v. Superior Court* (1979) 24 Cal.3d 1, 12.) It is guided by the purposes of the Act: "(1) to promote full communication between public employers and employees, and (2) to improve personnel management and employer-employee relations. (§ 3500.)" (*Claremont Police Officers Assn. v. City of Claremont* (2006) 39 Cal.4th 623, 630.)

To fulfill this purpose, the Board has imposed limitations on the bargaining process nonexistent in private labor relationships. For example, the Board has prohibited the permanent replacement of striking workers. (Compare *Fremont Unified School Dist.* (1990) PERB Dec. No. 1054-E at pp. 10-11 [14 PERC ¶ 21107] with *Vessey & Co. v. Agricultural Labor Relations Bd.* (1989) 210 Cal.App.3d 629, 654, citing *National Labor Rel. Bd. v. Mackay Radio & T. Co.* (1938) 304 U.S. 333, 345-346 [82 L.Ed. 1381, 1389-1390] [if a private employer has permanently filled a position held by an economic striker before receiving the striker's offer to return to work, the striker is entitled to reinstatement as jobs become available].) The Board has also prohibited employees from striking before an impasse except on specified grounds. (Compare *County of Trinity (United Public Employees of California, Local 792)* (2016) PERB Dec. No. 2480-M at p. 3 [40 PERC ¶

22

171] [a strike occurring before an impasse and completion of any required impasse procedures creates a rebuttable presumption the union has breached its duty to bargain in good faith] with *N.L.R.B. v. Insurance Agents' International* (1960) 361 U.S. 477, 489-491 [4 L.Ed.2d 454, 463-466] [National Labor Relations Board lacks authority to limit a union's economic tools, including to prohibit it from striking before an impasse].)  The Board has further allowed employers to enjoin potentially striking employees from striking if the absence of those employees would harm public health or safety.  (*City of San Jose v. Operating Engineers Local Union No. 3* (2010) 49 Cal.4th 597, 611; *County Sanitation Dist. No. 2 v. Los Angeles County Employees' Assn.* (1985) 38 Cal.3d 564, 585-587.)

Given the restrictions in place for public labor relationships that do not exist for their private counterparts, the County's conduct would be perceived differently by a public-sector employee subject to the additional restrictions in comparison to a private-sector employee not subject to those restrictions.  For example, a private-sector employee, like the employees in *Pacific Mutual Door*, would not see the inability to return to work for 30 days following the end of a strike inherently destructive to the right to strike when that same employee risks permanent replacement, and the inability to return to work at all, by choosing to strike. (*Pacific Mutual Door*, *supra*, 278 NLRB at pp. 855-856.)  Similarly, a private-sector union would not perceive the inability to promptly return to work inherently destructive if it too had strong economic weapons, like the ability to call a strike before an impasse and for all its members to strike regardless of their importance to the business's functionality.  Instead, public-sector employees, like members here, face restrictions on when they can strike and the detrimental effect of their strike, under the promise they can return to their jobs.  This playing field allows the risk public-sector employees undertake to be more predictable and within their own control.  Taking control from the public-sector employee by extending a strike period (in this case more than doubling the strike period) serves to unpredictably increase the risk the employee undertakes and undoubtedly discourages future striking

23

activity to a greater degree than on the federal landscape. Thus, the Board's departure from federal authority was justified.

Still, the County disagrees, arguing the Board misjudged the labor negotiation playing field by failing to consider the narrow conditions necessary for an injunction and the federal law excepting supervisors from the definition of employees, thus making supervisors incapable of participating in a strike, unlike the case here. (See *Santa Clara County Counsel Attys. Assn. v. Woodside* (1994) 7 Cal.4th 525, 537). We are not persuaded. As discussed, the Board's departure from federal law has a justified basis grounded in the particulars of California public-sector labor law. Applying the clearly erroneous standard of review, the County cannot demonstrate the Board acted in excess of its authority when determining the County's conduct was inherently destructive.

B

*The Board's Newly Announced Test Pertaining To Contracts With Strike*

*Replacement Companies In Public Health Care Settings Was Not Clearly Erroneous*

The County contends the Board's newly announced three-part test is clearly erroneous by attacking all three parts of the test. Again, the test requires a public health care employer to "prove that: (1) it made a good faith effort in the marketplace to negotiate a strike replacement contract that would eliminate any minimum shift guarantee or shorten it to the greatest degree possible, but it ultimately needed to agree to the minimum shift guarantee in order to maintain critical health care services; (2) it barred employees from work only because such a contractual commitment temporarily reduced available work opportunities, and it filled all remaining opportunities without discriminating against employees based on whether they worked during the strike or engaged in any other actual or perceived protected activity; and (3) it provided the employees' union with timely notice regarding any decision to guarantee replacement workers a minimum work period or to modify the terms of such a guarantee, and, if requested, bargained in good faith over the potential effects on bargaining unit employees."

24

1

*Part One*

As it pertains to the first part, the County argues the test's assessment of an employer's "good faith effort in the marketplace to negotiate a strike replacement contract that would eliminate any minimum shift guarantee or shorten it to the greatest degree possible" necessarily views the hiring of a strike replacement company as inherently destructive conduct and requires an employer to choose the contract with the shortest shift guarantee without regard to countervailing interests.  This is so, the County argues, despite the Board's exception stated within the test itself that the health care employer could ultimately agree to a longer shift guarantee "in order to maintain critical health care services."  We disagree.

The Board's decision does not suggest it believed entering into a replacement contract containing a minimum shift guarantee would *always* constitute conduct inherently destructive to protected rights.  The Board determined *the County's* use of this type of contract was inherently destructive.  The decision lays out a three-part test to be read in light of an inherently destructive or comparatively slight finding.

Comparatively slight conduct is excused upon evidence the employer's actions were motivated by legitimate and substantial business justifications.  (*Campbell Municipal Employees Assn. v. City of Campbell*, *supra*, 131 Cal.App.3d at p. 424.)  But, when considering comparatively slight conduct, the stronger the tendency to harm, the greater the employer's burden to show its business need was important and that it narrowly tailored its actions or rules to attain that purpose while limiting harm to protected rights as much as possible.  (*City of San Diego* (2020) PERB Decision No. 2747-M at p. 36, fn. 19 [45 PERC ¶ 45].)  Thus, while an inherently destructive standard requires the most tailoring, comparatively slight conduct produces a sliding scale dependent on the level of harm inflicted by an employer.  This sliding scale is consistent with the first part of the test that balances an employer's good faith effort to eliminate minimum shift guarantees from

25

contracts with strike replacement companies against its ability to maintain critical health care services. Indeed, the standards fit together well.

As the County argues, there are various concerns relevant to a health care employers' efforts to hire replacement workers and maintain critical health care services, including the quality of the replacement workers offered, a hospital's prior experience with the replacement company, the reliability of the replacement staff offered, and how the replacement company otherwise serves a hospital's needs. Under a comparatively slight framework, these considerations are relevant to whether a hospital tailored its legitimate and substantial business justifications to the need to hire replacement workers with a minimum shift guarantee and is also relevant to an inherently destructive framework to demonstrate a hospital acted out of a business necessity. The test announced by the Board allows for the nuance the County demands and does not treat every employer who enters a strike replacement contract containing a minimum shift guarantee as having committed inherently destructive conduct. Nor does the test provide an illusory balancing of hospital interests.

The County also challenges the first part of the test by pointing to various National Labor Relations Board decisions for the proposition that those decisions did not require employers to shop around for a strike replacement company with a lower minimum shift guarantee. (Citing *Pacific Mutual Door Co.*, *supra*, 278 NLRB at p. 854; *Sutter Roseville Medical Center*, *supra*, 348 NLRB at p. 637; *Encino Tarzana*, *supra*, 332 NLRB at p. 914; *Roosevelt Memorial Medical Center* (2006) 348 NLRB 1016.) These decisions are the same decisions the County cited when arguing the Board impermissibly diverged from federal authority by declaring its conduct inherently destructive. For the same reasons we concluded that divergence justified, i.e., the stricter limits on public employers' use of economic weapons compared to the restrictions governing their private sector counterparts, we conclude the Board's divergence from federal authority in this regard justified as well. (See *McPherson v. Public Employment Relations Bd.*, *supra*, 189 Cal.App.3d at pp. 307-308.)

*Part Two*

The County challenges the second part of the Board's test -- that a hospital-employer is permitted to bar employees from work only when the minimum shift guarantee reduced work opportunities, but must offer remaining work opportunities without discriminating against those who participated in protected activity -- on the ground that federal law permits employers to bar employees from work for the entire duration of the strike replacement contract regardless of work opportunities in the period between the conclusion of a strike and the end of the minimum shift guarantee. We agree with the Board that federal authority pertaining to strike replacement contracts is confusing as to how an employer must offer available work opportunities in the period following a strike and before the end of a minimum shift guarantee.

The County relies again on *Pacific Mutual Door*, *Sutter Roseville Medical Center*, *Encino Tarzana*, and *Roosevelt Memorial Medical Center* for its argument to undercut the second part to the Board's test. While the National Labor Relations Board broadly stated a rule in *Encino Tarzana*, *supra*, 332 NLRB at pages 917-918, and *Sutter Roseville Medical Center*, *supra*, 348 NLRB at page 642, purportedly from *Pacific Mutual Door*, *supra*, 278 NLRB at page 856, that until a minimum shift guarantee has been canceled or satisfied, an employer has a legitimate and substantial business justification for delaying reinstatement of strikers, that broad rule is not called into question here. Indeed, the Board adopted a substantially similar standard in the second part of its test by recognizing minimum shift guarantees as a justified reason to deny work opportunities to striking employees after a strike has ended.

As it pertains to how an employer offers work opportunities not covered by replacement workers in the period after a strike but before the end of the minimum shift guarantee, *Pacific Door* and *Encino Tarzana* are silent. (*Encino Tarzana*, *supra*, 332 NLRB at p. 918 ["The only reason that everyone who was scheduled during the Three-Day Period

was not needed was the lawful presence of the temporary replacements"]; *Pacific Door*, *supra*, 278 NLRB at pp. 855-856.) " 'It is axiomatic that cases are not authority for propositions not considered.' " (*In re Marriage of Cornejo* (1996) 13 Cal.4th 381, 388.)

*Sutter Roseville Medical Center*, on the other hand, supports the second part of the Board's test. There, the union "conceded the Respondent [Hospital] had a legitimate business justification for retaining the employment agency-supplied temporary employees for the period for which they were contracted" but the National Labor Relations Board found it unlawful to fill available poststrike work opportunities with supervisors and transferees not affiliated with the employment agency instead of striking employees. (*Sutter Roseville Medical Center*, *supra*, 348 NLRB at pp. 645-647.) Similarly, in *Roosevelt Memorial Medical Center*, a union notified a hospital of a strike prompting a hospital administrator to hire replacement workers with a minimum shift guarantee. The union thereafter called off the strike and the hospital administrator reworked the schedule to integrate as many striking employees as possible to work as close to their prestrike hours as possible. The National Labor Relations Board found the hospital's conduct comparatively slight and its unilateral scheduling (because the union refused to participate when requested) lawful given the efforts taken by the administrator and the few employees who were affected by the schedule change.[7] (*Roosevelt Memorial Medical Center*, *supra*, 348 NLRB at pp. 1017-1021.) Both of these cases stand for the proposition adopted by the Board that strikers can be denied work based on a minimum shift guarantee, but to the extent work

---

[7]     *Roosevelt Memorial Medical Center* provides an example of how a hospital's conduct in hiring strike replacement companies with minimum shift guarantees can be determined comparatively slight, as opposed to inherently destructive, and a hospital's efforts can potentially satisfy the Board's three-part test. Indeed, the National Labor Relations Board noted how the hospital administrator's efforts showed potentially striking members that striking was not futile or discouraged, and any detriment was felt temporarily instead of targeted at future protected activity. (*Roosevelt Memorial Medical Center*, *supra*, 348 NLRB at pp. 1018-1019.)

opportunities arise, those opportunities must be offered on a nondiscriminatory basis. (See also *The Waterbury Hospital* (1990) 300 NLRB 992, 1007 [when no permanent replacements hired, employers must reinstate all employees (both strikers and nonstrikers) equally].) Accordingly, the second part of the Board's test is not clearly erroneous.

3

*Part Three*

The County challenges the third part of the Board's new test -- that a hospital-employer provide a union with timely notice of a decision to hire replacement workers with a minimum shift guarantee, and if requested, bargain in good faith over the potential impacts on bargaining unit employees -- on seven grounds.

First, the County argues it has the unquestionable right to prepare for a strike of its health care employees, including by hiring replacement workers. Indeed, the County argues, the hiring of replacement workers is similar to other strike preparations typically performed confidentially. But the County fails to cite any legal authority for this proposition. (See Cal. Rules of Court, rule 8.204(a)(1)(B) [parties must "support each point by argument and, if possible, by citation of authority" otherwise the contention is forfeited]; *McComber v. Wells* (1999) 72 Cal.App.4th 512, 522.) Moreover, notifying union members of a minimum shift guarantee for replacement workers or bargaining with them regarding the impacts of such a decision does not inhibit an employer's ability to prepare for a strike or otherwise minimize the disruption to an employer's business. To be sure, the test does not require an employer to secure its employees' permission before entering into a contract with a strike replacement company. In fact, communicating with employees about the minimum shift guarantee with replacement workers would have minimized the disruption here and established clear standards instead of the confusion that resulted from the surprise minimum term and available leave designations. (See § 3500 [purpose of the Act is to promote communication between employers and employees].)

Second, the County argues part three of the newly enacted test is clearly erroneous because it imposes a one-sided duty on the employer to provide notice of a minimum shift guarantee and to bargain with union members regarding the impacts of such a contract term. To the County, a union would have an incentive to increase costs to the County under these circumstances, and the County would have no comparable opportunity to minimize the effects of the strike. Similarly, the County's remaining arguments pertain to a union's incentive to use an employer's newly enacted duty to bargain over strike impacts as a way to file more charges before the Board and stall otherwise substantive and productive negotiations between the union and the employer.

The County has failed to demonstrate how these policy considerations could lead to a clearly erroneous conclusion on our part. Indeed, the County does not argue this part of the test is contrary to Board precedent or federal authority. It instead presents multiple policy considerations in an attempt to guide us to the conclusion the test is a bad idea. But the Board's duties are two-fold: "(1) to promote full communication between public employers and employees, and (2) to improve personnel management and employer-employee relations." (*Claremont Police Officers Assn. v. City of Claremont*, *supra*, 39 Cal.4th at p. 630.) The third part of the Board's test clearly seeks to foster these purposes and lead to better communication and relations between public health care employers and their employees.

Finally, the County argues the Board's consideration of this factor is particularly unfair because there was no allegation in the complaint the County violated the Act by failing to notify Nurses it entered into a contract with a strike replacement company that contained a minimum shift guarantee, nor that it failed to bargain over the impacts of such a decision. Again, we do not see how this consideration leads to a conclusion the test the Board announced was clearly erroneous in light of its duties under the Act and its precedent. Instead, the County appears to be arguing the Board abused its discretion by imposing remedial orders beyond that which were alleged and litigated. We will address this

30

argument *post*; but, as far as the County's attempt to demonstrate the Board's test is erroneous, we are unpersuaded.

C

*The Board's Determination The County Unlawfully Prohibited Members From Using Paid Leave For The Three Days After The Strike Was Not Clearly Erroneous*

The County contends the Board clearly erred by finding its refusal to allow members to use paid leave for days they were barred from returning to work constituted discrimination and interference because there is no evidence the County did so based on protected activity. To the contrary, the County argues, it treated the three days after the strike as it would any other time an employee did not work a scheduled shift.

We note the County does not analyze this issue under the well-established discrimination or interference standards. Instead, it offers what it believes to be contradictions in the Board's reasoning without citation to authority or analysis as to how the Board's reasoning fails to meet the well-established standards. "To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error. [Citations.] When a point is asserted without argument and authority for the proposition, 'it is deemed to be without foundation and requires no discussion by the reviewing court.' [Citations.] Hence, conclusory claims of error will fail." (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.)

In any event, the Board found the County both interfered with and discriminated against protected activity when denying use of paid leave for the three days following the strike. To establish a prima facie interference case, a charging party must show an employer's conduct tends to or does result in some harm to union or employee rights protected by the Act. Importantly, the charging party does not need to show an improper motive. (*City of San Diego*, *supra*, PERB Dec. No. 2747-M at p. 36.) Thus, as far as an interference claim is concerned, the County's argument the Board erred because no evidence demonstrated the County denied paid leave *based on* Nurses' and members'

31

exercise of protected rights fails at the outset. The County's prohibition against the use of accrued leave by striking members for the three days following the strike resulted in striking members not being paid, despite a willingness to work, for more than twice as long as members had anticipated. This harmed Nurses' and members' protected rights because it discouraged future striking activity by expanding the risk involved in striking beyond the control of those participating in the strike as described *ante*. There was no need to demonstrate the County's acts were motivated by Nurses' and members' exercise of protected rights, and we fail to see how the County's practice in other contexts is relevant to how it treated striking employees differently following the strike.

Similarly, a finding of discrimination is not dependent on a showing the County's conduct was motivated by a discriminatory intent. Indeed, if an employer's conduct facially discriminates based on protected activity, it constitutes " 'discrimination in its simplest form,' " and the Board may thus infer unlawful discrimination without further evidence of motive. (*Los Angeles Superior Court*, *supra*, PERB Dec. No. 2566-C at p. 14.) The Culberson memo explicitly prohibited *striking* members from returning to work for three days after the strike and the County then refused to allow those members to use accrued time to offset the lost time at work. The County did not target nonstriking members in the days following the strike in the same way; some of the nonstriking members chose not to work because the essential worker injunction was no longer in effect.

Further, the evidence did not establish the County was prevented from offering members the use of accrued leave. In fact, the County permitted members to use accrued time when it prohibited them from working during scheduled shifts because of low patient census. The fact the memorandum of understanding provided for this type of furlough is of no consequence. Our focus is on the County's actions in the face of members' protected activity. (§ 3506.) Snyder's and Culberson's testimony establish the County's only concern was paying for double staff. But Snyder testified accrued leave was already allocated to members and existed in a pot of money different from that which paid wages. In the only

32

other instance in which the County prohibited members from working scheduled shifts, the County offered members use of their accrued leave. The fact the County did not similarly do so in the days following the strike supports the Board's determination the County's prohibition was based on Nurses' and members' exercise of protected activity. Thus, the Board did not clearly err by finding a nexus between protected activity and the adverse action taken by the County. (See *Novato Unified School District*, *supra*, PERB Dec. No. 0210-E at pp. 73-74.)

## III

### *The Board's Decision Is Supported By Substantial Evidence*

The County contends the Board's decision is not supported by substantial evidence because no evidence supports its findings the County failed to make a good faith effort to negotiate for a contract with the least minimum shift guarantee and it discriminated against strike participants when offering available work following the strike. We disagree.

The Board's factual findings, which include credibility findings, are conclusive if substantial evidence on the whole record supports them. (See § 3564, subd. (c).) We do not reweigh the evidence but accept the Board's reasonable inferences. (*Boling v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 912-913.) Even if contrary findings may seem equally or even more reasonable than the Board's findings, we uphold the Board's decision as supported by substantial evidence if the Board's findings are reasonable. (*Regents of University of California v. Public Employment Relations Bd.* (1986) 41 Cal.3d 601, 617.)

### A

### *The Board's Factual Finding The County Did Not Make A Good Faith Effort*
### *To Reduce The Minimum Shift Guarantee Is Supported By Substantial Evidence*

The Board determined "[t]he County did not establish that it made a good faith effort in the marketplace to negotiate a contract that would eliminate the minimum shift guarantee or shorten it to the greatest degree possible." The Board based this finding on the County's

33

inadequate efforts to collect bids from strike replacement companies, the lack of testimony supplied by the County demonstrating the industry standard regarding the length of minimum shift guarantees for strike replacement workers, and the County's failure to negotiate the length of the minimum shift guarantee. The County argues insufficient evidence was presented at the administrative hearing to support the Board's finding the County failed to collect a sufficient number of bids and failed to adequately negotiate the length of the minimum shift guarantee.[8]

Addressing the County's efforts to collect bids for strike replacement workers, the County argues the Board's observation that the County had plenty of time before the strike to solicit bids from strike replacement companies penalized the County for planning ahead to protect its ability to provide patients with vital health services. Not so. The Board did not hold it against the County that it contracted with Healthsource in October 2019, long before the strike. The Board considered the four months the County searched for strike replacement companies between June and October 2019 and determined those four months were plenty of time in which to research and communicate with multiple strike replacement companies to find the best one to serve the County's needs. The Board did not suggest the County should have taken longer or delayed entering into a contract until closer to the actual strike.

The County also questions why the Board thought soliciting bids from three strike replacement companies was insufficient. The Board did not say soliciting bids from three strike replacement companies was insufficient. The Board thought the County's solicitation

---

[8]     The County also challenges the Board's finding it "likely knew, or should have known, that [Nurses] and [the Service Employees Union] commonly hold strikes lasting fewer than five days at many California hospitals." We do not address this challenge because the Board did not consider this fact as evidence the County did not act in good faith. It considered this fact to question "why the County failed to negotiate over the minimum shift guarantee before executing a replacement contract." It is this latter consideration that supported the Board's lack of good faith finding, and it is this consideration we review.

34

of the three companies at issue was insufficient.  Indeed, Maxim was not a strike replacement company and the County was having problems with Maxim's services at the time it requested a bid for strike replacement workers.  The evidence on this point supports the Board's finding the County never seriously entertained Maxim as an option, and thus the County did not adhere to its own policy of obtaining three quotes before contracting with a strike replacement company.

As a practical matter, the County solicited a bid from a prohibitively expensive strike replacement company and a company with whom it had negotiated in the past.  The County was unaware of any other options in the marketplace and presented no evidence pertaining to the contents of a typical contract with a strike replacement company for the Board to compare to the County's ultimate contract.  While the County was unaware of the particulars of the Board's new test, it was aware it would need to justify its decision with a legitimate business reason or business necessity.  (See *Campbell Municipal Employees Assn. v. City of Campbell*, *supra*, 131 Cal.App.3d at p. 423.)  As discussed *ante*, and contrary to the County's argument here, this requirement does not negate the importance of the County's considerations when contracting with a strike replacement company, but instead balances its efforts with the impacts its decision had on members who exercise protected activity.  The County has raised no arguments undermining the Board's finding the County made inadequate efforts to collect bids from strike replacement companies and has presented no evidence regarding the industry standard pertaining to minimum shift guarantees.

Addressing the County's failure to negotiate a shorter minimum shift guarantee, the County disputes the Board's finding that " '[h]ad the County negotiated in a timely manner to change the [minimum shift guarantee] as it sought to change other contract terms, it is more likely than not that [Healthsource] would have reduced the minimum period in order to secure the County's business.' "  First, the County contends it tried to negotiate a lesser minimum shift guarantee.  The Board agreed the County tried to negotiate a lesser minimum

shift guarantee; however, the Board's issue was that the attempt to lower the contractual term happened *after* the County had already entered into a contract with Healthsource containing a five-shift minimum guarantee. At that point, the County's bargaining power had already been reduced and Healthsource had no incentive to agree to a different term than the term already in the contract. This finding, and the reasonable inference regarding bargaining power flowing therefrom, are supported by Snyder's testimony she did not negotiate the substance of the contract with Healthsource until after selecting Healthsource for the strike replacement contract.

The County also contends there was no evidence Healthsource would have agreed to a lower minimum shift guarantee given Elbahou's testimony the five-shift guarantee was Healthsource's standard term. But Elbahou's had no knowledge of other contracts entered into by Healthsource and he was not involved in many of the negotiations with the County. The Board took administrative notice of other Healthsource contracts demonstrating Healthsource had agreed to lower minimum shift guarantees, and the County does not argue the administrative notice was taken in error. The evidence demonstrated Healthsource had negotiated lower minimum shift guarantees in the past and may have done so again if the County had raised the issue before agreeing to enter into a contact with Healthsource. The County argues the context of the other contracts is much different than the one entered into with the County. But the County did not supply any evidence on that point, as it was required to do as the party bearing the burden of proving the affirmative defense. (*Great Dane*, *supra*, 388 U.S. at pp. 33-34 [18 L.Ed.2d at pp. 1034-1035].) Instead, it called Elbahou to testify and his knowledge was lacking as to the context of the other contracts. Accordingly, sufficient evidence supports the Board's finding the County failed to establish it made a good faith effort to enter into a contract containing as short a minimum shift guarantee as possible in light of maintaining critical health care services.

B

*The Board's Factual Finding The County Discriminated Against Strike Participants When Offering Available Work Is Supported By Substantial Evidence*

The Board found the County preferred nonstrikers over strikers when filling available work opportunities after the strike based on the County's admissions and deviation from established practices to offer full-time nurses work opportunities before other types of nurses. The County disputes this finding, arguing it never admitted or stipulated it treated striking members differently than nonstriking workers and there was no evidence pertaining to the County's established practices. We disagree.

The evidence established the County filled striking members' shifts during the two-day strike with strike replacement workers, traveling nurses, and essential employee members enjoined from striking. When the strike was over and members attempted to work their scheduled shifts, Culberson told members the shifts were filled and that members were not needed to fill shifts. It was not until essential employees enjoined from striking refused to work, because they were no longer under an order to do so, that the County attempted to fill available work opportunities with striking members. But work opportunities not covered by strike replacement workers were available after the strike, the County just kept in place the nonstriking members and traveling nurses it had relied on during the strike. The County stipulated to this fact and admitted as much during testimony. Based on these admissions, we need not address the County's argument the call-off order for low census furloughs contained in the memorandum of understanding did not constitute the County's established practice. Accordingly, sufficient evidence supports the Board's finding the County preferred nonstriking workers to fill available work opportunities following the strike.

IV

*The Board's Chosen Remedy Was Not An Abuse Of Discretion*

The County contends the Board imposed an overbroad and punitive remedy by ordering the County to pay members for the period of time they were barred from work, and

37

to offer this pay structure in the future. The County raises several arguments in this regard: that it should not be required to pay members who were offered work opportunities during the three days after the strike but refused to return to work; that the Board's remedy of providing the use of accrued leave contradicts the rule it announced that the County bargain over the impacts of a minimum shift guarantee that lasts longer than a planned strike; that the remedy does more than make members whole because, as the Board acknowledged, members' absences were not due to low patient census, making vacation pay unavailable in the first instance; and that Nurses never alleged the County committed an unfair practice by failing to negotiate the impacts of a delayed return-to-work schedule, thus it was outside the Board's authority to remedy an unalleged violation. We disagree.

The Board "has broad powers to remedy a violation of the Act. ([Citations]; see § 3509, subd. (b) ['The initial determination as to whether the charge of unfair practice is justified and, if so, the appropriate remedy to effectuate the purposes of [the Act], shall be a matter within the exclusive jurisdiction of [the Board] . . . .']; see also § 3541.3, subd. (i) . . . ; § 3541.3, subd. (n) . . . .)" (*Boling v. Public Employment Relations Bd.* (2019) 33 Cal.App.5th 376, 387 (*Boling II*).)

The Board also has "the power to issue [an] . . . order directing an offending party to cease and desist from the unfair practice and to take such affirmative action, including but not limited to the reinstatement of employees with or without back pay, as will effectuate the policies of this chapter." (§ 3541.5, subd. (c); see also Cal. Code Regs., tit. 8, § 32325 ["The Board shall have the power to issue a decision and order in an unfair practice case directing an offending party to cease and desist from the unfair practice and to take such affirmative action . . . as will effectuate the policies of the applicable statute"].)

We review the Board's remedial orders for abuse of discretion. (*Boling II*, *supra*, 33 Cal.App.5th at p. 387.) "Generally, a 'remedial order "should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can be fairly said to effectuate the policies of the Act." [Citations.]' ([Citations]; *Jasmine Vineyards, Inc. v.*

*Agricultural Labor Relations Bd.* (1980) 113 Cal.App.3d 968, 982 . . . ['[i]t is only when the remedies ordered by the Board are patently outside the Board's authority that a reviewing court can interfere'].) [¶] Nonetheless, [the Board's] remedial orders may not be punitive. [Citation.] They may not violate the separation of powers doctrine. [Citation.] And, they may not encroach upon statutes and policies unrelated to the Act and, therefore, outside of [the Board's] competence to administer." (*Boling II*, *supra*, 33 Cal.App.5th at pp. 387-388.)

The Board's order that the County allow members to use accrued leave, even if those members refused to return to work when ordered to do so, was not an abuse of discretion. The Board grounded this decision in the particular facts of the case, leading us to conclude the decision was not guided by punitive intentions. When attempting to return to work, members inquired whether Culberson had invoked the furlough process outlined in the memorandum of understanding. Culberson testified he was not clear and misspoke. He also testified he never told members they were not being furloughed pursuant to the memorandum of understanding. Given this misunderstanding, the Board justifiably treated members who refused to return to work similar to members who were never requested to return to work.

The Board imposed the remedy of allowing members to use accrued leave based on the County's discriminatory prohibition against it and the County's discriminatory policy instituting a delayed return-to-work schedule. As discussed, *ante*, these determinations were not clearly erroneous. Accordingly, the use of paid leave makes members whole in the sense it puts them in the position they expected to be in when notifying the County of the two-day strike. Indeed, this remedy actually benefits the County in that sense because it pulls upon a pot of money already allocated to members instead of forcing the County to pay the wages members expected to make when notifying the County of the strike.

The Board's order to permit members to use accrued leave in similar future situations, unless the parties agree otherwise, was also not an abuse of discretion. The County argues this remedy contradicts the Board's newly announced rule that it will bargain

over the impacts of a minimum shift guarantee. We disagree because the Board's order is specific to the County and Nurses and their established practices and not applicable to all labor disputes involving all health care providers. The County treated members differently after the strike than it treated them in the only other similar situation in which members are prohibited from working when they are otherwise able and willing to work -- furloughs due to low patient census. The County argues the Board erred because the fact members can use accrued leave in the event of the low patient furloughs was a bargained-for perk specific to times when the Hospital has a low patient census. But the County has not pointed to any other circumstance where members are told not to work a scheduled shift through no fault of their own and then denied pay and the use of accrued leave. Indeed, several members testified that it was their understanding that whenever they are prevented from working a scheduled shift but are willing to work, they consider it a "furlough" and are permitted to use accrued leave. Thus, the only reason members would not be permitted to use accrued leave under the circumstances present here is because members exercised their protected right to strike. That is discrimination in its purest form (*Los Angeles Superior Court*, *supra*, PERB. Dec. No. 2566-C at p. 14), and the Board acted within its authority to prevent the County from engaging in discriminatory practices in the future.

Finally, it is of no concern that Nurses did not allege the County committed an unfair practice by failing to bargain over the impacts of a delayed return-to-work schedule. The fact the County did not attempt to lessen the impacts of a delayed return-to-work schedule was subsumed in Nurses' allegations the County discriminated against and interfered with protected activity by threatening and implementing a delayed return-to-work schedule and by penalizing members for not working scheduled shifts when the failure to work was outside of their control. The Board's remedial order remedies the discrimination and interference resulting from these adverse actions, which could have been lessened by notice and negotiations over impacts, and the Board did not need to ground its orders in a separate failure-to-bargain finding.

40

V

*The Board Did Not Err By Applying Its Newly Announced Test Retroactively*

The County contends the Board's newly announced test should not have been applied retroactively because the County relied on settled and persuasive National Labor Relations Board decisions finding contracts with strike replacement companies containing minimum shift guarantees to be conduct that is comparatively slight and justifying delays in reinstating workers. We disagree.

" 'As a general rule, judicial decisions are given retroactive effect, even if they represent a clear change in the law. [Citation.] The exception is when considerations of fairness and public policy are so compelling in a particular case that, on balance, they outweigh the considerations that underlie the basic rule. [Citation.] This exception applies in particular when a party justifiably has relied on the former rule.' " (*Bearden v. U.S. Borax, Inc.* (2006) 138 Cal.App.4th 429, 442.)

As the County points out, the Board has no settled rule regarding contracts with strike replacement companies. Indeed, the Board has never decided whether an employer's conduct in contracting with a strike replacement company requiring a minimum shift guarantee constitutes inherently destructive or comparatively slight conduct. Even with its decision here, the Board did not determine that such conduct always constitutes inherently destructive conduct, but instead determined the inquiry was highly factual and dependent on the totality of an employer's conduct and considerations when hiring a strike replacement company. The County asserts it looked to persuasive authority when entering into a contract and it was unforeseen that the Board would diverge from that persuasive authority. The County's assertions are disingenuous considering the multiple instances in which the Board has diverged from National Labor Relations Board decisions. (See, e.g., *City of San Jose v. Operating Engineers Local Union No. 3*, *supra*, 49 Cal.4th at p. 611; *Fremont Unified School Dist.*, *supra*, PERB Dec. No. 1054-E at pp. 10-11; *County of Trinity (United Public Employees of California, Local 792)*, *supra*, PERB Dec. No. 2480-M at p. 3.) Thus,

the County has not shown a reasonable reliance on the National Labor Relations Board rule, and the Board did not err by applying its newly-announced test retroactively.

DISPOSITION

The Board's decision is affirmed. The parties shall bear their own costs.

/s/
Robie, Acting P.J.

We concur:

/s/
Mauro, J.

/s/
Earl, J.